The United States *ex rel.* C. K. Davis, U. S. District
Attorney,

*vs.*

John Shanks, Probate Judge of Morrison County, Min-
nesota, and Ezra Briggs.

That part of the Indian reservations described and provided for in the
treaty made with the Chippewa Indians, Feb. 22, 1855, which was
granted to the Chief Hole-in-the day under the exception and stipulation
contained in the subsequent treaty of May 7, 1864, continued to retain
its character as an Indian reservation notwithstanding such grant.

Hole-in-the-day, a chief of the Chippewas with whom the United States
had treaty relations, and an Indian of unmixed blood, and residing at
the time of his death upon the land so granted to him, was not a citizen
of the United States, nor of the state of Minnesota, and though said land
lay within the territorial limits of Cass county, which was attached to
Morrison county, the probate court of the latter county possessed no
jurisdiction over his estate.

This was an application made to the supreme court for a
writ of prohibition directed to the respondents.   The appli-
cation was based upon the following statement in the peti-
tion.   An Indian chief named Que-we-zance, but who was
commonly called Hole-in-the-day, was chief of the Missis-
sippi, Pillager and Lake Winnebagoshish bands of the Chip-
pewa Indians in Minnesota.   The nations to which these
bands belonged held treaty relations with the United States
at the time of the death of Hole-in-the-day, which occurred
in the year 1868, or 1869.   By the treaty of May 7, 1864,
between the United States and these bands of Indians, cer-

tain reservations of said bands were ceded to the United States, excepting, however, one section of land in one of such reservations to be located by the Secretary of the Interior, and on July 24, 1866, a patent issued therefor from the United States to Hole-in-the-day.

Besides this property Hole-in-the-day was possessed at the time of his death of considerable personal property.

This Indian at the time of his death was indebted to various persons, on account of money lent, and goods sold to him, and these creditors instituted proceedings in the probate court of Morrison county, Minnesota, of which court the said John Shanks was judge, for administration upon the said estate, and the court entertained the proceedings, and appointed the said Ezra Briggs administrator. Mr. Briggs accepted the appointment, proceeded to convert a portion of the estate into money, and had announced his intention to take the same course with the remainder of the estate, both real and personal, for the purpose of satisfying the said debts.

At this stage of the proceedings, the United States commenced this proceeding in its capacity of guardian, by operation of law, of the heirs of Hole-in-the-day, and by virtue of its other protective and legal relations to them.

The supreme court, as prayed, granted a writ of prohibition, *pendente lite*, and ordered thereby that the respondents show cause at the July term, 1870, why they should not be absolutely restrained from further proceedings in the administration of said estate.

The respondents showed cause at that term, and, after admitting that Hole-in-the-day owned said real property and certain personal estate, and that said probate court had granted letters of administration, alleged that he was indebted at the time of his death to citizens of Minnesota, in

the sum of about fifteen hundred dollars : that these debts had been allowed by said probate court; that the administrator had made application to said probate court for license to sell the real estate for the payment of the debts in accordance with the laws of Minnesota, which application was pending and undetermined when the writ of prohibition, *pendente lite,* was served. The respondents further alleged that while the application for license to sell was pending, certain persons, claiming to be the heirs of Hole-in-the-day, had appeared by attorney in the probate court, and moved to dismiss the proceedings for the same reason set forth in the petition for the writ of prohibition; which motion, it was alleged, was still pending and undecided.

C. K. Davis, U. S. District Attorney, for Relator.

I.—This proceeding is warranted by the decision of the court in *Home Ins. Co. vs. Flint,* 13 *Minn., p.* 244; *Dayton vs. Paine et al., id.* 493.

II.—By *Art.* 1, *Sec.* 8, *Const. U. S.,* power is conferred upon Congress "to regulate commerce with the Indian tribes."

This provision also extends to the regulation of commerce with the individual members of such tribes. *United States vs. Holliday,* 3 *Wall.,* 407, *and cases cited.*

III.—In the exercise of this power thus conferred by the constitution, Congress has enacted that "all executory contracts made and entered into by any Indian for the payment of money or goods, shall be deemed and held to be null and void and of no binding effect whatever." 9 *U. S. Statutes, p.* 203, *Act of March* 3, 1847, *Sec.* 3.

IV.—The Indians, whether considered as to their tribal relations or as to their individual status, are domestic, dependent nations, holding towards the federal government

a relation resembling that of ward towards guardian. *Wheat. El. of Int. Law, p.* 53.

The death of a member of an Indian tribe confers upon a state no right to administer upon his property for the following reasons:

1. The distribution of his property cannot be controlled by state laws. Its devolution depends upon the custom and usages of the tribe to which he belongs. The tribe *quoad hoc* is an independent nation, subject to the paternal protectorate established over it by the United States. No state can acquire any rights in this respect except by treaty with the Indian nation, and no state of the Union can make any such treaty. (*Sec.* 10, *Art.* 1, *Cons. U. S.*) The exemption of an ambassador is analagous. His personal effects, within the territory of the state to which he is accredited, are entirely exempt from the local jurisdiction. *Wheat. El. of Int. Law, pp.* 287, 316.

2. As to the real property of an Indian, the state cannot affect it by any legislative or judicial proceeding, for the reason that when a cession of such real property is made, the federal government, or its appointee, must be the recipient of the cession. *Cherokee Nation vs. State of Georgia,* 5 *Peters* 1; *Worcester vs. State of Georgia,* 6 *Peters* 515; 3 *Kent Comm.* (*marg. p.*) 382 *et seq.*

Now if an Indian cannot make any executory contract, no creditor can enforce payment of this void debt by administration upon any of his property personal and real. Especially cannot this be done by a sale of real property in probate proceedings when such sale can vest no title whatever.

3. When an Indian dies, his successors stand in the same relation to the federal government in which he stood. Indians are wards of the United States in the most comprehensive sense of the word. In other words, the United

United States ex rel. v. Shanks.

States is the "legal representative" of these persons, and is not to be subjected to such proceedings as these, to restrain which it has invoked this writ of prohibition. Were this not so, the constitutional power "to regulate commerce" and the laws enacted and treaties made thereunder, would be subject to abridgment by the diverse policies of the different states and the contradictory decisions of many courts.

V.—By the provisions of the treaty mentioned in the petition, the land in question is expressly excepted from the cession to the United States. *Vol. 13 U. S. Stat. p.* 693. It is therefore still an Indian reservation, over which the state courts have no jurisdiction.

VI.—In support of these propositions, we call the attention of the court to the various provisions of the "trade and intercourse act" of July 30, 1834. *Vol. 4 U. S. Stat. p.* 427; *P. 427 vol.* 1 *Brightley's Digest*; *Johnson vs. McIntosh*, 8 *Wheat.* 543; *Mitchell vs. United States*, 9 *Peters* 711; *Foster vs. Board of Commissioners*, 7 *Minn. p.* 140.

VII.—The prohibition should for these reasons be made absolute.

HAYS & KERR, for Respondents.

I.—1st. The probate court may have jurisdiction for other purposes, as distribution and the like, even though there be no claims against the estate.

2nd. The probate court must be held to have jurisdiction unless it appears that there is some other forum, having jurisdiction, to which the administration can be referred. Otherwise the estate might be left without any jurisdiction to take charge of it or to determine the rights of parties interested in it.

3rd. If the probate court can be ousted of jurisdiction on this writ it must be on the ground that there is, in the

Indian tribe to which the deceased is alleged to have belonged, another forum competent to take charge of and distribute the estate and having paramount jurisdiction; and the existence of such forum must be made to appear affirmatively and clearly. In order to deprive the probate court of jurisdiction, in any event, it should appear that Hole-in-the-day was, at the time of his death, a member of an Indian tribe which had an internal organization and polity, and laws or customs governing the tenure and descent of property, and what those laws or customs are. See *Dole vs. Irish*, 2 *Barb.* 639, where this proof is properly made. Otherwise, the presumption arises that the property of the deceased, if not subject to the laws of the state, belongs to the first occupant. *Brashear vs. Williams*, 10 *Ala.* 630. 2 *Kent's Com. 5th Ed.* 318. *Blackstone's Com. Bk.* 2, *p.* 2 & 3. And no jurisdiction otherwise appears to which the administration can be referred.

4th. But, if it were shown that there is a competent foreign tribunal to assume the administration, the probate court is not compelled by comity to surrender the administration; but may retain the estate and make distribution according to the *lex domicilii* if the case requires it. 2 *Kent's Com. 5th Ed.* 432. *Harvey vs. Richards*, 1 *Mason's Rep.* 403.

The probate court may make distribution according to the laws or customs of an Indian tribe in a proper case; and especially may this power be exercised when there is any doubt about the existence of any appropriate tribunal or means of administering the estate and making distribution in the Indian tribe.

5th. Nor can the probate court be compelled to surrender the estate to a foreign jurisdiction until all lawful claims of citizens of this state have been paid. 2 *Kent's Com.*, 431.

United States ex rel. v. Shanks.

6th.   The guardianship of the United States over Indian tribes extends only to securing to them their rights under the law and protecting them from unlawful encroachments. It does not remove them from the operation of the ordinary rules of international law and comity in those respects in which they are regarded as distinct and foreign nationalities.   And it operates upon them only as tribes, and upon individuals as members of tribes.   This doctrine of "wardship" and "pupilage" grew out of direct attempts on the part of states to subvert the authority of Indian tribes within their own country, and to overthrow their separate nationality.   This doctrine is not founded upon any act of Congress, or anything in the constitution, but is a mere dictum of the courts drawn from the relations of the Indian tribes to the United States.   It is a mere *quasi* guardianship—not an actual relationship of guardian and ward.

II.—1st.   The probate court is the sole judge of the *question of fact* upon which its jurisdiction depends.   *Britain vs. Kinnaird*, 1 *Brod. & Bing.*, 432; *Gray vs. Cookson*, 16 *East.*, 13; *Suydam vs. Keys*, 13 *Johns.*, 444; *People vs. Dibble*, 16 *N. Y.*, 203; *Dayton vs. Paine*, 13 *Minn.*, 493. It follows that if, upon any conceivable state of facts, consistent with the facts as they are made to appear to this court, the probate court could have such jurisdiction, this writ cannot be sustained.

III.—1st.   The power of Congress to regulate commerce with Indians is conferred and limited by the third clause of the 8th section, article 1st, of the constitution of the United States.   It applies only to commerce in their (the Indian's) own country; and to Indians living together, within their own territory, as a distinct tribe or community, governed by their own laws.   Beyond this the power of the federal government, in any of its departments, cannot be extended.

*Foster vs. Bd. Co. Com'rs,* 5 *Minn.,* 140; *United States vs. Baily,* 1 *McLean,* 236; *United States vs. Cisna,* 1 *McLean,* 257; *Manoy vs. Wooden,* 17 *Wend.,* 531.

The laws of the United States regulating commerce with Indians cannot apply to an individual Indian living separate and apart from his tribe within the jurisdiction of a state, on lands owned by him in fee simple.

2d. The act of March 3d, 1847, which enacts that all executory contracts with Indians, shall be *deemed* and *held* to be void, applies only to Indians who live together as tribes on their reservations and not within the jurisdiction of a state.

The meaning of that clause is limited by the remainder of the section in which it occurs. It applies only to the *payment of annuities,* and means that such contracts shall be *deemed* and *held* to be void in the payment of annuities to the Indians. It is an amendment to section 11 of the act of June 30th, 1834, and was intended only to prevent Indians from assigning their annuities or charging them with debts contracted beforehand, an abuse which had grown up under the section amended. *See the context, Brightly's Dig.* 1 *vol. p.* 424. *Also* 6 *Opinion Attorney General,* 49.

IV.—Lands granted to Indians under a treaty which vests the title in them are liable to the payment of their debts under the laws of the state in which they are situated, and are assets in the hands of an administrator for the payment of such debts, and may be sold for that purpose without the consent of the President. *Godfrey vs. Beardsley,* 2 *McLean* 412; *Lowry vs. Weaver,* 4 *McLean* 82; 2 *Greene* (*Iowa*) 94; 1 *Greene* (*Iowa*) 575; *Opin. Att'y Gen'l, vol.* 4, *p.* 529, *and vol.* 3, *pp.* 578 *and* 596. In 10 *Ala.* 630, before cited, it is held that after the extension of the laws of a

state over an Indian tribe, property in possession of Indians is *prima facie* liable for the payment of their debts.

V.—1st. The United States has but a proprietary interest in the lands within the borders of this state. The sovereignty is in the state. The only limitation upon the state in regard to the questions cognizable in its courts are those created by the adoption of the state constitution. The state has not relinquished jurisdiction over questions of private rights. *State of Minnesota vs. Batchelder,* 5 *Minn.* 223 ; *Foster vs. Bd. Co. Com'rs.* 7 *Minn.* 148 ; *Camp vs. Smith,* 2 *Minn.* 155.

The United States has no jurisdiction or control over unpatented lands within a state, save what it derives from the terms of cession and the *ordinance of July 13th,* 1787, (1 *Kent's Com.* 260.)

The terms of that ordinance, which are made a condition in the act authorizing a state government in Minnesota, (*Rev. St.* 24) and accepted in the state constitution (*Art.* II. *Sec.* 3) merely prevent the state from interfering with the "*primary disposal* of the soil," and securing a good title to purchasers.

When the right of "*primary disposal*" has once been exercised by the United States, and it has conveyed the title, all its jurisdiction and control ceases, and the jurisdiction of the state becomes complete.

2nd. It is urged then, that, by the cession of the land involved in this case, in the treaty of May 7th, 1864, and the subsequent conveyance by the United States to Hole-in the-day, it came as completely within the jurisdiction of the state as any other patented land.

The exclusive power of Congress to regulate commerce with Indian tribes is confined to those lands owned by the tribe in common, *Manoy vs. Wooden,* 17 *Wend.* 531.

3rd. The allegation of the writ that the Indian title to

this land has not been extinguished is a mere conclusion of law which is repugnant to the allegations of fact, that the land was ceded, by the Indian tribes owning it, to the United States, and by the United States conveyed, by patent, to the deceased in fee simple. The "Indian title" is a title in all the tribe in common, and is incompatible with the title in fee simple held by the deceased in severalty. 3 *Hawks*, 155; 6 *Port.* 403, as to title derived by cession and patent.

VI.—The writ seems to be based on the supposition that the deceased being an Indian of unmixed blood and connected with a tribe holding treaty relations with the United States, his property could not, under any circumstances, be subject to the laws of the state, or the jurisdiction of its courts :

Whilst we submit and urge, on the other hand, that if the decedent resided without any "Indian country" or reservation, and within the territorial limits of a state, he and his property are completely under the jurisdiction and laws of the state, and his rights of property and liability on contracts are determined by the laws of the state, and the laws of the United States do not and *cannot* reach or apply to him :

And that the guardianship of the United States, which cannot in any case extend beyond mere protection of the Indians in their rights under the law, does not apply to him.

*By the Court*—McMILLAN, J.—It fully appears that Hole-in-the-day, the deceased, was an Indian of unmixed blood, and was at the time of his death, and for a long time prior thereto, had been a Chief of the Chippewas of the Mississippi, Pillager, and Lake Winnebagoshish bands of Chippewa Indians, in Minnesota; that he and the said bands did at the time of his death hold treaty relations to

the United States; that his children and heirs are Indians; that the said Hole-in-the-day was at the time of his death possessed of personal property, and of certain real estate hereinafter mentioned.

It appears that by treaty of May 7, 1864, between the United States of America, and the said Chippewas of the Mississippi and Pillager and Lake Winnebagoshish bands of Chippewa Indians in Minnesota, "the reservations known as Gull Lake, Mille Lac, Sandy Lake, Rabbit Lake, Pokagomin Lake, and Rice Lake, as described in the second clause of the second article of the treaty with the Chippewas of the 22d of February, 1855, are ceded to the United States, excepting　*　*　*　*　one section of land, to be located by the Secretary of the Interior, on ·the southeast side of ·Gull Lake, and which is hereby granted in fee simple to the chief Hole-in-the-day," &c.　That in pursuance of the requirements of the said treaty, the Secretary of the Interior of the United States did afterwards locate within the limits of the property so ceded, the. following described property; section six in town one hundred and thirty-four, north of range twenty-eight, west, the same being a fractional section and containing 292.98 acres, also section one in said town, and in range twenty-nine, west, the same being a fractional section and containing 233.68 acres; also lots one, two and three, in section two in said town, and range last mentioned, containing 95.01 acres; also lot one, in section twelve, in the town and range last mentioned, containing 47.50 acres; and that on July 24, 1866, a patent issued from the United States to said Hole-in-the-day, therefor; that the said Hole-in-the-day at the time of his death resided upon the premises aforesaid, and that said premises lie· wholly in Cass county, Minnesota.　Upon this state of facts, we are of opinion that the probate court of Morrison county had no jurisdiction of the estate of the deceased for any purpose.

We take judicial notice of the treaty of February 22, 1855, between the United States and the bands of Indians above mentioned, by the second article of which certain lands described therein are *reserved and set apart* for the permanent homes of the said bands of Indians. 10 *U. S. Stat. at L.* 1166. These were therefore Indian reservations, and these reservations are the lands ceded by the treaty of May 7th, 1864. 13 *U. S. Stat. at L.* 693. The portion of the original reservation granted in fee to Hole-in-the-Day being expressly excepted from the cession in the latter treaty, and the exception and grant being made in favor of and to Hole-in-the Day, an Indian and Chief of the bands executing the treaty, the land excepted and embraced in the grant must retain its original character as an Indian reservation, from which the jurisdiction of the state for civil purposes, at least, was excluded.

The Indians within our territory have always been considered and recognised by the United States as distinct political communities; and so far as is essential to constitute them separate nations, the rights of sovereignty have been conceded to them. *Worcester vs. the State of Georgia*, 6 *Peters*, 515. The intestate, Indian chief Hole-in-the-Day, therefore, was not a citizen of the State of Minnesota, nor of the United States, but belonged to a separate nation, upon whom the laws of the state beyond the territorial limits of the state could have no force; and the Indian reservation, which was in his occupancy, and upon which he resided, was not embraced within the civil jurisdiction of the state. The law of the domicil and the law of the place where the property is situated are identical, and none of the questions which arise where these differ, are presented in this case. The state did not give the law to either.

The state court, therefore, having no jurisdiction, it is not for us to look further.   If it were necessary to find a jurisdiction, we might find it in the United States Government, which has under the constitution power to regulate commerce with these Indian tribes, and who although separate nations are yet under the protection of the general government (*Story on the Constitution, sec.* 110, *and authorities cited*), and the immediate superintendence of its officers and agent; or in the Indian tribe to which the deceased belonged.   The absolute Writ of Prohibition should be granted.