In the Matter of ROBERT E. PATTERSON, Respondent, against THE COUNCIL OF THE SENECA NATION, Appellant.

Jurisdiction — Indians — Seneca Nation of Indians retains right to determine its membership — Supreme Court of this State without jurisdiction to issue mandamus requiring enrollment of petitioner as member of nation — relations between Seneca Nation and State of New York — tribe remains separate nation, retaining powers of self-government — jurisdiction of Peacemakers' Courts extends to all civil causes arising between individual Indians residing on reservation except those reserved to Surrogates' Courts — quære whether the Peacemakers' Courts may determine whether a co-ordinate branch of the nation has followed the Indian Law.

1. The Seneca Nation of Indians has retained for itself that prerequisite to their self-preservation and integrity as a nation, the right to determine by whom its membership shall be constituted. The Supreme Court of this State, therefore, has no jurisdiction to issue an alternative order of mandamus, to the Council of the Seneca Nation, requiring it to enroll the petitioner and to accord him all personal and property rights as a member of such nation.

2. A contention that the Seneca Nation and the State of New York enjoy a relation *inter se* peculiar to themselves; that the Seneca Nation, by its constitution adopted in the year 1848, submitted itself to the laws of the State and the jurisdiction of State courts; that the State of New York, at the request of the nation, thereafter enacted legislation to govern the Seneca Indians in their mutual relations; that the laws of the State of New York alone apply to this issue and that under them the petitioner has a clear right to the relief demanded, cannot be sustained. Upon examination of the constitution and legislation referred to, the conclusion is inescapable that the Seneca tribe remains a separate nation; that its powers of self-government

28

are retained with the sanction of the State; that the ancient customs and usages of the nation, except in a few particulars, remain, unabolished, the law of the Indian land; that in its capacity of sovereign nation the Seneca Nation is not subservient to the orders and directions of the courts of New York State, and that the Seneca Nation retains for itself the power of determining who are Senecas, and in that respect is above interference and dictation. (*United States ex rel. Kennedy* v. *Tyler*, 269 U. S. 13, distinguished.)

3. Nor can it be successfully contended that the jurisdiction of the Peacemaker's Court is limited by the Indian Law (§ 46) to " matters, disputes and controversies between any Indians residing upon such reservation " which may arise upon " contracts or for wrongs." The Peacemaker's Court is the creation not of the State but of the Indian constitution and by such constitution, as amended in 1898, such courts are given " exclusive jurisdiction in all civil causes arising between individual Indians residing on said reservations, except those which the surrogates' courts have jurisdiction of," without reference to " contracts " or to " wrongs." Moreover the question whether or not the petitioner is a Seneca Indian, entitled to enrollment as such, is primarily not a judicial but a political question to be determined by the nation, through its council, according to its laws, usages and customs.

4. *Quære*, whether the Peacemakers' Courts have power to determine whether a co-ordinate branch of the nation has followed the laws of the Indian land.

*Matter of Patterson* v. *Council of Seneca Nation*, 219 App. Div. 857, reversed.

(Argued May 2, 1927; decided July 20, 1927.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered March 16, 1927, which unanimously affirmed an order of Special Term granting a motion for an alternative order of mandamus requiring the council to enroll the petitioner as a member of the Seneca Nation.

*George P. Decker* for appellants. The New York judiciary is alien and without any territorial jurisdiction over the Senecas. (*Seneca Nation* v. *Appleby*, 196 N. Y. 323; *Ryan* v. *Knorr*, 19 Hun, 540; *Dole* v. *Irish*, 2 Barb. 693.) The roll of members of the Seneca Nation is a matter outside the power of New York to control

through its Legislature or its judiciary if either should assume to do so and neither has assumed to do so heretofore. (*Cherokee Nation* v. *Georgia*, 5 Pet. 1; *Worcester* v. *Georgia*, 6 Pet. 515; *U. S.* v. *Kagama*, 118 U. S. 384; *Matter of Kansas Indians*, 5 Wall. 755; *Matter of Heff*, 197 U. S. 506; *U. S.* v. *Dick*, 208 U. S. 356; *West* v. *Hitchcock*, 205 U. S. 80; *People* v. *McKenna*, 188 App. Div. 368; *Cherokee Trust Funds*, 117 U. S. 288; *Stephen* v. *Cherokee Nation*, 174 N. Y. 445; *Old Settlers* v. *United States*, 148 U. S. 427; *Cherokee Inter Marriage Cases*, 203 U. S. 76.) Section 5 of the Indian Law was never intended to cover a case of mandamus. (*People ex rel. Broderick* v. *Morton*, 156 N. Y. 136; *Mulkins* v. *Snow*, 232 N. Y. 252.)

*John L. Heider* for respondent. The Seneca Indians are not an alien, independent people. (*Matter of Heff*, 197 U. S. 488.) The New York State courts have jurisdiction over the Seneca Nation of Indians. (*United States* v. *Tyler*, 269 U. S. 13.) The Seneca Indians abolished their government in the year 1848 and subjected themselves to the jurisdiction of New York State. (*United States* v. *Waldow*, 294 Fed. Rep. 111.) The Seneca Indians recognize the jurisdiction of New York courts and the power of the New York courts to control their internal affairs. (*Seneca Nation* v. *Christie*, 49 Hun, 524; 126 N. Y. 122; *Seneca Nation* v. *Appleby*, 127 App. Div. 770; 196 N. Y. 318; *Seneca Nation* v. *Lehly*, 55 Hun, 83; *Seneca Nation* v. *Hugaboom*, 132 N. Y. 493.)

KELLOGG, J. The question to be determined is whether an alternative order of mandamus, issued out of the Supreme Court of the State of New York to the Council of the Seneca Nation of American Indians, requiring it to enroll the petitioner as a member of the Seneca Nation and to accord him all personal and property rights of a member of such Nation, was within the jurisdiction of the court so issuing it.

The petition alleges that the petitioner is of full age; that he resides on the Cattaraugus Indian Reservation in Erie county, New York; that he is the son of Nathaniel C. Patterson, deceased, a duly enrolled member of the Seneca Nation; that his mother is a white woman; that his parents were duly married; that after their marriage they lived together on the Cattaraugus Reservation; that the petitioner has frequently demanded of the Council of the Seneca Nation that he be enrolled as a member; that the request has been refused; that the United States Commissioner of Indian Affairs has refused to enroll him; that the pretended reason for the refusal has been that there is a custom among the Senecas that only a person born of a mother who was duly enrolled as a Seneca Indian may himself be enrolled; that the petitioner's mother was not so enrolled; that in fact there is no such custom; that any and every custom of the Senecas has been superseded by the laws of the State of New York; that the Seneca Nation, on December 4, 1848, amended their existing form of government, their laws, customs and usages; that they then petitioned the State of New York to provide them with laws; that they adopted a new constitution and prayed the State and the United States to approve the same; that such constitution was subsequently approved by the two governments; that, pursuant to the request of the Senecas, the State of New York enacted various laws for the government of such nation; that such laws are now embodied in the Consolidated Laws, known as the Indian Law (Cons. Laws, ch. 26); that membership in the Seneca Nation is valuable in that the governments of the United States and the State of New York set aside moneys for use by members of the tribe, and that membership gives the right to vote and to participate in the community property of the Senecas. Annexed to the petition is a copy of the constitution of the Seneca Nation of Indians alleged to have been adopted on the 4th of December, 1848. In opposition to the

petition, the president of the Seneca Nation filed an affidavit wherein it is asserted that under the immemorial customs and usages of the nation, property has always descended through the mother; that these customs and usages still persist; that they were not abolished by the new constitution or by the laws of the State of New York; that the Seneca Nation itself may alone determine who is a Seneca Indian entitled to enrollment. Appended to the affidavit is a document entitled " Amended Constitution of the Seneca Nation of Indians of 1898." Upon these papers the Supreme Court, at Special Term, made an order requiring the Council of the Seneca Nation of American Indians to enroll the petitioner as a member of such nation; to pay him his share of annuities as a member; to permit him to participate as a voter in elections held by the nation; to accord to him his property rights as a member thereof; to show cause why the order should not be obeyed, and to file a return thereto within twenty days. The order was affirmed by the Appellate Division, which granted leave to appeal to this court and certified, to be answered by it, the following question: " Has the Supreme Court of the State of New York jurisdiction of this proceeding? "

The status of an Indian tribe which has retained its tribal integrity has been variously described. In *Cherokee Nation* v. *State of Georgia* (5 Pet. [U. S.] 1) it was said by MARSHALL, Ch. J., that the argument that the Cherokee Nation was a " distinct political society, separated from others, capable of managing its own affairs and governing itself " was approved by a majority of the court. He further said of the various Indian tribes: " They may, more correctly, perhaps, be denominated domestic dependent nations." In *Worcester* v. *State of Georgia* (6 Pet. [U. S.] 515) the same chief justice, in speaking of the relation created by a treaty between the United States and the Cherokee Nation, said: " This relation was that of a nation claiming and receiving the protection of one more powerful:

not that of individuals abandoning their national character, and submitting as subjects to the laws of a master." In *Seneca Nation of Indians* v. *Appleby* (196 N. Y. 318) this court, through CULLEN, Ch. J., in reference to the Indians, said: " They are not citizens of the State and their tribes, though not treated as independent foreign nations, are not subject to the jurisdiction of the State to the same extent as its citizens." In *People ex rel. Cusick* v. *Daly* (212 N. Y. 183) this court, through WERNER, J., said: " The Indians, although native sons of our soil, are not citizens either of the nation or State. They are heralded as the wards of the nation, and in their collective or tribal capacity they have been relegated to the status of foreign nations with whom the Federal government has entered into treaty relations." In *Mulkins* v. *Snow* (232 N. Y. 47) this court, through POUND, J., said: " The lands in question are held by the Seneca Indians, as a distinct although a dependent nation, by conquest from other aboriginal tribes." Again it said: " The Seneca Nation of Indians is a *quasi* foreign nation and its reservation is *quasi* extra territorial." Unless these expressions, as well as similar expressions many times used by many courts in various jurisdictions, are mere words of flattery designed to soothe Indian sensibilities; unless the last vestige of separate national life has been withdrawn from the Indian tribes by encroaching State legislation; then, surely, it must follow that the Seneca Nation of Indians has retained for itself that prerequisite to their self-preservation and integrity as a nation, the right to determine by whom its membership shall be constituted.

Not only have the various courts of the Union frequently declared the Indian tribes to be distinct and separate nations, but they have frequently held that the usages and customs of these nations, rather than the laws of the State within the borders of which they dwell, govern the relations of members of the nations among

themselves. In *Worcester* v. *State of Georgia (supra)* it was held that the State of Georgia was powerless to extend. its criminal and civil laws over the Cherokee tribes. In *Kansas Indians* (5 Wall. [U. S.] 737) it was said by DAVIS, J., that as long as the United States recognizes the national character of the Indian tribes, they are under the protection of treaties and the laws of Congress, " and their property is withdrawn from the operation of State laws." In *Dole* v. *Irish* (2 Barb. 639) it was held that the private property of the Seneca Indians was not within the jurisdiction of the State of New York for purposes of administration; that letters of administration granted by a county surrogate upon the estate of a dead Indian were void. The court said: " We have not attempted to extend our laws to their domestic relations, or to regulate the manner of their acquiring, holding or conveying property among themselves." In *Hastings* v. *Farmer* (4 N. Y. 293) it was said of the Onondaga Indian: " He is governed by the laws and usages of his tribe, and is only subject to our laws, so far as the public safety requires." These two New York cases are cited with approval by the United States Supreme Court in *Jones* v. *Meehan* (175 U. S. 1). In *United States* v. *Kagama* (118 U. S. 375) the court said of Indian tribes: " They owe no allegiance to the States, and receive from them no protection." Commenting upon the case of *Worcester* v. *State of Georgia (supra)* the court said that it was there held that the Indians " could not be subjected to the laws of the State and the process of its courts." In *Jones* v. *Meehan (supra)* it was said in regard to a certain Indian chief that since he was a member of an Indian tribe, whose tribal organization was still recognized by the United States, " the right of inheritance in his land, at the time of his death, was controlled by the laws, usages and customs of the tribe, and not by the law of the State of Minnesota." In so holding the court cited, among others, the cases of *Brown*

v. *Steele* (23 Kans. 672), in which the opinion was written by Mr. Justice BREWER, and *United States ex rel. Davis* v. *Shanks* (15 Minn. 369). In *United States* v. *Quiver* (241 U. S. 602) it was said that at an early period it became the settled policy of Congress to permit the "personal and domestic relations of the Indians with each other to be regulated, and offenses by one Indian against the person or property of another Indian to be dealt with, according to their tribal customs and laws;" that by virtue of the Federal act of 1885 (23 U. S. Statutes at Large, 385) the courts of the United States have been vested with exclusive jurisdiction over seven major crimes therein specified; that "In other respects the policy remained as before." In the recently decided case of *Mulkins* v. *Snow* (*supra*) Judge POUND said: "The contention has been made with some force that when Congress does not act, no law runs on an Indian reservation save the Indian tribal law and custom." It must be the law, therefore, that, unless the Seneca Nation of Indians and the State of New York enjoy a relation *inter se* peculiar to themselves, the right to enrollment of the petitioner, with its attending property rights, depends upon the laws and usages of the Seneca Nation and is to be determined by that nation for itself, without interference or dictation from the Supreme Court of the State.

The respondent asserts that a peculiar relation does exist; that the Seneca Nation, by its constitution adopted in the year 1848, submitted itself to the laws of the State and the jurisdiction of State courts; that the State of New York, at the request of the nation, thereafter enacted legislation to govern the Seneca Indians in their mutual relations; that the laws of the State of New York alone apply to this issue; that under them the respondent has a clear right to the relief demanded. It is true that in the recent case of *United States ex rel. Kennedy* v. *Tyler* (269 U. S. 13) the Supreme Court of the United States stated that the State of New York, as early as the year 1849, " assumed

1927.]              Opinion, per KELLOGG, J.          [245 N. Y. 433]

governmental control " of the Indians at their request, created and defined the jurisdiction of the Peacemakers Court, and administered the laws enacted " through its courts." We do not understand, however, that that court undertook to define, for the courts of the State, the relation between the State and the Seneca Indians, or to determine that the statutes of the State applied to the tribal Indians, or that its courts had jurisdiction over them. On the contrary, it expressly declined to make the determination, saying: " In the regular and ordinary course of procedure, the power of the highest State court in respect of such questions should first be exhausted."

The preamble to the constitution adopted by the Seneca Nation of Indians in the year 1848 in part states as follows: " But to remedy these defects, we proclaim and establish the following Constitution or Charter, and implore the governments of the United States and the State of New York to aid in providing us with laws under which life shall be possible." Section 19 provides: " The laws passed by the Legislature of the State of New York *for the protection and improvement of the Seneca Nation of Indians,* and also all laws and regulations heretofore adopted by the Chiefs in legal Council assembled shall continue in full force and effect as heretofore *except so far as they are inconsistent with the provisions of this Constitution or Charter.*" The words which we have italicized are significant. Laws enacted by the State of New York must be " for the protection and improvement of the Seneca Nation of Indians." They must not be " inconsistent with the provisions of this Constitution or Charter." Section 1 provides: " Our government shall have Legislative, Executive and Judiciary departments." The legislative power is to be vested in a council to be called the " Councillors of the Seneca Nation." The executive power is to be vested in a president. Section 4 provides: " The Judiciary power shall be vested in three peace makers on each reservation; any two of whom have power to hold

courts, subject to an appeal to the Council, and to such courts of the State of New York as the Legislature thereof shall permit." Section 5 provides: "All causes of which the peace makers have not jurisdiction, may be heard before the Council or such courts of the State of New York as the Legislature thereof shall permit." Section 6 provides that the "power of making treaties shall be vested in the Council." Section 16 provides: "The rights of any members of the ancient confederacy of the Iroquois to the occupancy of our lands and other privileges shall be respected as heretofore." In March, 1849, the Legislature of the State of New York passed a resolution approving the new constitution of the Senecas and directed the officers of the State to respect the new "Constitutional Government." The constitution of the Senecas was amended in the year 1898. The amended constitution was "ratified and confirmed" by the Legislature of the State of New York by the enactment of chapter 252 of the Laws of 1900. The amended constitution provides: "The legislative power shall be vested in a council of sixteen members, who shall be called the Councillors of the Seneca Nation of Indians, of whom eight shall be elected every two years for the Cattaraugus and eight for the Allegany Reservation." It further provides: "The judiciary power shall be vested in courts to be known by the name of peacemakers and surrogate's courts. The peacemakers court shall be composed of three members each, one court to be established upon the Cattaraugus and the other upon the Allegany Reservation." Again it provides: "Peacemakers courts shall have exclusive jurisdiction in all civil causes arising between individual Indians residing on said reservations, except those which the surrogates courts have jurisdiction of." It further provides that there shall be one surrogate for each reservation and that they shall be known as surrogates, and "shall have jurisdiction of all matters on each reservation for which they are respectively

elected, the same as surrogates of the different counties of the State of New York have." Thus did the Seneca Nation, far from abdicating its sovereign powers, set up a strong central government, distribute all governmental powers among three departments, empower a legislative body to be called the " Councillors of the Seneca Nation " to make necessary laws, create a president to execute them, and establish a peacemakers court and a surrogate's court to interpret the laws of the nation and decide causes. Thus did the Legislature of the State of New York twice approve of the constitution adopted and the government set up. It was not accurate to say, therefore, that the State of New York in the year 1849 " assumed governmental control" of the Indians. On the contrary, in that year and subsequently, by its approval of the Indian constitution in its original and amended form, the State of New York acknowledged the Seneca Indians to be a separate nation, a self-governing people, having a central government with appropriate departments to make laws, to administer and to interpret them. It is true that the constitution gave consent of the nation that laws might be passed " by the Legislature of the State of New York for the protection and improvement of the Seneca Nation of Indians," but only in so far as such laws might not be " inconsistent with the provisions of this Constitution or Charter." It gave no consent that the common law of the State of New York should obtain on the Indian reservations. It did not abrogate the customary laws of the nation. The ancient usages and customs of the Seneca Nation, therefore, except as modified by the constitution, or as they might be modified by appropriate legislation of the nation or State, continued as the law of the Indian land.

Various statutes passed by the New York Legislature in relation to the Indians are now embodied in the " Indian Law." Article 4 of that law is entitled " The Seneca Indians." It doubtless embodies the statutes passed

pursuant to the request of the Seneca Nation contained in its constitution of 1848. This article purports to set up a government for the Seneca Nation, consisting of three departments, exactly as provided in the Indian constitution. It must be held, however, that the Indian Nation itself created these departments and the system of government set up by its Constitution, the force of which had been expressly acknowledged by the New York Legislature. It purported to set up a Peacemakers Court. The source of jurisdiction of that court, however, was the Indian constitution, not the Indian Law. Thus, in *Mulkins* v. *Snow* (*supra*) this court said: " The Peacemakers' Court is not a mere statutory local court of inferior jurisdiction. It is an Indian court, which has been recognized and given strength and authority by statute. It does not owe its existence to the State statute and is only in a qualified sense a State court." The article provides for the manner in which the elections of officers shall be had by the Seneca Nation; for the ascertainment of legal voters at such elections; for the keeping of records by the nation's clerk; for the giving of a bond by the nation's treasurer; for the keeping of records by the Peacemakers Courts; for the taking and hearing of appeals to the Council of the nation; for the service of process by the nation's marshal; for the enforcement of judgments; for the allotment of common lands; for the punishing of those giving or receiving bribes; for various other details of administering the affairs of the government. In these respects the article covers a field not occupied by the Indian constitution; it makes enactments not inconsistent therewith; it supplements the constitution and provides legislation not before existent, as requested by the nation. In section 55 of the article there is a definite sanction of Seneca usages and customs. It is therein provided that all lands on the reservations shall be held in common by the Seneca Nation, " subject to control of the Council thereof,"

except lands cultivated and improved by an Indian family " in accordance with the laws and usages of the Seneca nation."

The Indian Law, and especially article 4 thereof, is chiefly notable for the almost complete omission therefrom of any legislative enactments upon matters other than those appertaining to administrative details. The law imposes the marriage and divorce laws of the State upon the Indian nations; it prohibits suits against Indians upon contracts; it forbids the sale or exchange of spirituous liquors for any article received from an Indian in payment, exchange or pawn. It does not otherwise make applicable to Indians either the common law or statute law of the State, whether civil or criminal. It does not abrogate Indian customs or usages. It does not provide for the descent of property through the father rather than through the mother, as prescribed by the customs of many Indian nations. It does not provide what shall be the qualifications of membership in the Seneca or any other Indian nation. The conclusion is inescapable that the Seneca tribe remains a separate nation; that its powers of self-government are retained with the sanction of the State; that the ancient customs and usages of the nation, except in a few particulars, remain, unabolished, the law of the Indian land; that in its capacity of a sovereign nation the Seneca Nation is not subservient to the orders and directions of the courts of New York State; that, above all, the Seneca Nation retains for itself the power of determining who are Senecas, and in that respect is above interference and dictation.

The respondent argues that the jurisdiction of the Peacemakers Court is limited by the Indian Law (Section 46) to " matters, disputes and controversies between any Indians residing upon such reservation " which may arise upon " contracts or for wrongs." We answer that the Peacemakers Court is the creation not of the State but of the Indian constitution; that by such constitution,

as amended in 1898, the Peacemakers Courts are given
" exclusive jurisdiction in all civil causes arising between
individual Indians residing on said reservations, except
those which the surrogates courts have jurisdiction of,"
without reference to " contracts " or to " wrongs."    The
Indian Law does not deny comprehensive jurisdiction;
it merely fails to use terms apparently bestowing it.
The Indian constitution does bestow it.    Proceeding with
his argument, upon the false premise stated, the respond-
ent says that the Supreme Court had jurisdiction of this
controversy by reason of section 5 of the Indian Law.
That section reads: " Any demand or right of action,
jurisdiction of which is not conferred upon a peacemakers'
court, may be prosecuted and enforced in any court of
the state, the same as if all the parties thereto were
citizens."    In the first place we have shown that unlimited
jurisdiction was " conferred " by the Seneca constitution
upon such courts in respect to all controversies between
Indians upon the reservations.    In the second place it
cannot be understood that the Legislature intended to
include within the phrase " any demand or right of
action " mandamus orders, the essential nature of which
is to " command," not to " demand."    Moreover, the
question whether or not the respondent is a Seneca
Indian, entitled to enrollment as such, is primarily not
a judicial but a political question.    That question must
be determined by the self-governing Seneca Nation,
through its council, according to Seneca laws, usages and
customs.    It has not been shown that the council has
failed to follow any law or custom applicable to the
subject.    It may be that the Peacemakers Courts of the
Senecas have power to determine whether a co-ordinate
branch of that nation's government has followed the laws
of the Indian land and power to order it by mandamus
to obey them.    We need not and should not decide that
question, for it is a question for the Indian Nation, not
for us, to determine.    We hold merely this: That the courts

of the State of New York, under existing laws, have no jurisdiction to control by mandamus order, running to the government of the Seneca Nation, the membership of that nation. We refrain from determining whether or not the New York Legislature has the power to enact laws conferring jurisdiction to that end, if so advised. We conclude that the Special Term was without jurisdiction to grant the order.

The order of the Appellate Division and that of the Special Term should be reversed, and the application for a mandamus denied, with costs in all courts. The question certified should be answered in the negative.

CARDOZO, Ch. J., POUND, CRANE, ANDREWS, LEHMAN and O'BRIEN, JJ., concur.

Ordered accordingly.