UNITED STATES EX REL. LOWE *v.* FISHER, SEC-
RETARY OF THE INTERIOR.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 445. Argued November 14, 1911.—Decided January 29, 1912.

Where the Court of Claims has kept control of a case referred to it by act of Congress giving it jurisdiction as to all questions, its reply made to the request of the officer of the Government charged with execution of its judgment for further opinion is to be regarded as part of the decision.

The limitations on the right to return to the tribe in Art. IX of the Cherokee Treaty of August 11, 1866, refer to both freedmen and free colored persons; and freedmen and descendants of freedmen who did not return within six months are excluded from the benefit of the treaty.

Notwithstanding a decree of the Court of Claims determining the rights of Indians in a case over which Congress gave the court jurisdiction, it is competent for Congress to deal further with the subject. *Stephens* v. *Cherokee Nation,* 174 U. S. 445; *Wallace* v. *Adams,* 204 U. S. 415.

*Quære:* Whether a roll of citizenship of an Indian tribe, made under

direction of the Court of Claims, has the conclusive effect of a judicial decree.

Under the acts of Congress of 1902 and 1906 in regard thereto, the enrollment of freedmen of the Cherokee tribe was to be made in strict conformity with the decree of the Court of Claims, and should include only such persons of African descent, either free colored or the slaves of Cherokee citizens and their descendants, who were actual personal *bona fide* residents of the Cherokee Nation August 11, 1866, or who actually returned and established such residence within six months thereafter.

While the Secretary of the Interior did not have power to strike names from the roll of Cherokee citizens without notice and opportunity to be heard, he did have power, after such notice and opportunity had been given, to strike from the roll names which had been placed thereon through fraud or mistake.  *Garfield* v. *Goldsby*, 211 U. S. 249.

35 App. D. C. 524, affirmed.

THE facts, which involve the construction of the various treaties, acts of Congress and decisions of the Court of Claims in regard to the rights of Cherokee freedmen and their descendants to share in the. distribution of tribal property, are stated in this opinion.

*Mr. Charles H. Merillat,* with whom *Mr. Charles J. Kappler, Mr. J. K. Jones* and *Mr. Frank E. Duncan* were on the brief, for plaintiffs in error.

*Mr. Assistant Attorney General Harr* for defendant in error.

MR. JUSTICE McKENNA delivered the opinion of the court.

The case involves the question whether the Secretary of the Interior, after due hearing and after having made up a roll of citizens of the Five Civilized Tribes of Indians and after having issued certificates of allotment to the enrolled Indians, may strike their names from the roll after

giving due notice of his intended action and an opportunity to be heard.

The case arose upon the exercise of such power by the Secretary and an action of mandamus to require him to cancel his action. To the answer of the Secretary the Supreme Court of the District of Columbia sustained a demurrer and entered a judgment in accordance with the prayer of the petition. The Court of Appeals reversed the judgment. On return of the case to the Supreme Court the relators elected to stand on their demurrer and the court dismissed their petition. This action was affirmed by the Court of Appeals and the case was then brought here.

It was decided in *Garfield* v. *Goldsby*, 211 U. S. 249, that the Secretary had no such power without notice to the parties concerned and an opportunity to be heard. These conditions were performed in the present case, and, so far, the case is distinguished from the *Goldsby* *Case*. The power of the Secretary upon the rehearing under the applicable statutes is now to be considered.

The relators base their right of enrollment on Article IX of the Cherokee treaty of August 11, 1866 (14 Stat. 799), the material part of which is as follows: "They [Cherokee Nation] further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now resident therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees." It was found by the Secretary of the Interior that relators were descendants of liberated slaves, but he also found that their ancestors had not returned to the Cherokee Nation within six months of the date of the treaty, August 11, 1866. This must be assumed to be the fact, for it is alleged in the answer and admitted by the demurrer. Two propositions of law are, however, urged

by relators: (1) that the requirement of a return within the time designated applies only to free colored persons; and (2) that the Secretary having, on November 16, 1904, approved a list of Cherokee freedmen, containing the names of relators, on the ground that their ancestors had complied with the provision for return to the Nation, had no power to cancel their names.

(1) Article IX of the treaty is undoubtedly ambiguous, and to support their construction of it relators trace its genesis to the compulsion exercised on the Cherokee Nation by the United States for its espousal of the cause of the Confederacy during the Civil War. The Indians, it is said, were regarded as having forfeited their treaty rights, but the United States were willing to renew relations with them, stipulating, among other things, that "the institution of slavery, which has existed among several of the tribes, must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage, and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for."

The Indians resisted the conditions, and replied that it would not be for the benefit of the emancipated negro, nor for the Indians, to incorporate the former into the several tribes on an equal footing with the original members. They conceded, however, that the emancipated negro must be suitably provided for, and subsequently the Choctaws suggested that white persons should be excluded from their Territory, and that "no person of African descent, except our former slaves, or free persons of color who are now, or have been, residents of the Territory, will be permitted to reside in the Territory, unless formerly incorporated with some tribe, according to the usage of the band."

The Seminoles answered to the same effect, and asked that Article III be changed to admit only colored persons

lately held in bondage by them and free persons of color residing in the Nation previous to the rebellion, to a residence among them, and adoption in the Seminole tribe upon some plan to be agreed upon by them and approved by the Government. "We are willing," they said, "to provide for the colored people of our own Nation, but do not desire our lands to become colonization grounds for the negroes of other States and Territories." The Creeks expressed this in the same way, and the relators further adduce, as supporting their construction of Article IX, that the commission which negotiated the treaty, reporting on it officially, said: "Slavery is abolished and the full rights of the freedmen are acknowledged."

The history of Article IX, therefore, it is insisted, shows that the article consummated the purpose. In other words, when the Indians realized that they must provide for negroes, they limited their concession "to former slaves and then to any other negroes who had been in the Indian country at the outbreak of the war and might return within a short time after peace to make their home in the Indian Territory, thereby preventing a general influx of negroes who might seek free land." And the right to land, it is pointed out, was the consequence to be apprehended, as "lawful residence in the Indian Territory meant the right to occupy land."

It is further contended that the Cherokees acted upon the treaty practically in accordance with this construction of it, and that it was not until many years after that they "sought to refine it away and abrogate it in effect." They accepted it reluctantly, it is said, and subsequently contended that it conferred civil, not property, rights and passed what was known as the "Blood Bill," by which they sought to exclude all but native Cherokees by blood from participation in a large payment of funds which was about to be made. This gave rise to controversy, and Congress passed an act conferring jurisdiction on the

Court of Claims to settle the matter. The act is entitled "An act to refer to the Court of Claims certain claims of the Shawnee and Delaware Indians and the freedmen of the Cherokee Nation, and for other purposes." It was approved October 1, 1890 (26 Stat. 636, c. 1249). The Cherokee freedmen whose rights were to be determined under the act were those who "settled and located in the Cherokee Nation under the provisions and stipulations of article nine" of the treaty.

The court decided that under the Cherokee constitution of 1866 the freedmen became citizens equally with the Cherokees and equally interested in the common property and equally entitled to share in its proceeds *per capita.* But the court did not attempt an analysis of § 5 of the constitution nor of Article IX of the treaty (they are alike) but defined the rights of the freedmen and the free negroes in the language of the constitution and the article. 31 Court of Claims, 140. The opinion in the case, therefore, as delivered, had the same ambiguity as the constitution and treaty and was not understood by the Commissioner of Indian Affairs, who was charged by the Secretary of the Interior with the duty of determining who were the resident freedmen entitled to share in the disposition of the fund as decreed and who desired the further opinion of the court. In reply, the court said (31 Ct. Cl. 148):

"The court is of the opinion that the clauses in that article in these words, '*And are now residents therein, or who may return within six months, and their descendants,*' were intended, for the protection of the Cherokee Nation, as a limitation upon the number of persons who might avail themselves of the provisions of the treaty; and consequently that they refer to both the freedmen and the free colored persons previously named in the article. That is to say, freedmen and the descendants of freedmen who did not return within six months are excluded from the benefits of the treaty and of the decree."

Subsequently the court was called upon to add to its opinion, which it did, as follows: "The court is of the opinion that the *Act 2d March, 1895* (28 Stat. L., p. 910, § 11), prescribes the manner in which payments per capita shall be made and that the matter of payment is exclusively within the jurisdiction of the Secretary of the Interior. The court, after further consideration, adheres to the opinion communicated to the Commissioner of Indian Affairs February 18, 1896.

"The within motion for instructions is overruled." 31 Court of Claims, 140, 148.

The relators contend that the reply of the court to the Commissioner was not part of its decision. This, however, is a mistake. The court had kept control of the case, and at the time of its reply to the Commissioner the case was pending upon certain motions made by the parties. And, as we have seen, the court had been given special jurisdiction of the question and all others which were involved in the controversy. But it is contended that the only issue submitted to the court was whether "the Cherokee freedmen, as a class, were entitled to share in the proceeds of the Cherokee outlet or strip lands west of the 90th meridian." It is, hence, further contended that the jurisdictional act did not extend to the determination of what particular persons composed such class or who were freedmen, and that, therefore, "the point now involved has not had judicial determination."

The object of the contention, no doubt, is to clear the way for the ultimate contention upon which their case must rest, the want of power of the Secretary of the Interior over rolls which he had once approved and after having issued certificates of allotment to the enrolled Indians. In other words, relators would push aside the adjudication of their disqualification to be enrolled, they not having returned to the Cherokee Nation within the time designated by the treaty. They, however, make

an alternative contention and urge that they were adjudged to be within the provisions of the treaty by their enrollment upon the Kern-Clifton roll, which they insist was adjudged to be legal evidence of the rights of the freedmen; in other words, that the enrollment identified the individual freedmen who were entitled to participate in the tribal property.

It is admitted in the answer that relators are on the Kern-Clifton roll, and it does not seem to be contested that the roll was made under instructions from the Court of Claims. A plausible argument, therefore, is presented that it partakes of the conclusive effect to be attributed to a judicial decree. And it is further urged by relators that the Kern-Clifton roll was confirmed by the act of June 10, 1896 (29 Stat. 321, 329, c. 398), which declared "that the rolls of citizenship of the several tribes as now existing are hereby confirmed."

What effect we should have to give to the decree, assuming it to go as far as contended, we are not called upon to say. It was certainly competent for Congress further to deal with the subject. *Stephens* v. *Cherokee Nation,* 174 U. S. 445; *Wallace* v. *Adams,* 204 U. S. 415.

We pass, therefore, to a consideration of the act of June 10, 1896, upon which relators rely. It was one of a number of acts which exhibit a connected scheme for the enrollment of the members of the Five Civilized Tribes and the division of their tribal property; although their provisions are somewhat varying.

By the act of March 3, 1893 (§ 16, 27 Stat. 645), the Dawes Commission was created, with powers to negotiate with the tribes. In 1896, by the act of June 10th of that year (29 Stat. 321, c. 398), the Commission was directed to make up a roll of the citizens of the tribes, which included the Cherokees, who should apply within three months from the passage of the act, and to decide all such applications within ninety days after the same should be

made. Due force and effect was directed to. be given to
tribal rolls, usages, customs and laws, if not inconsistent
with Federal laws. The act contained the provision which
we have already quoted, that is, "that the rolls of citizen-
ship of the several tribes as now existing are' hereby con-
firmed." There were powers of review given to those
aggrieved by the decision either of the Commission or the
tribal authorities. The relators, however, say that "the
Dawes Commission, as is matter of official history, did
not adopt the tribal rolls as confirmed, but proceeded to
try the rights of persons to be on the tribal rolls, and the
controversy which ensued continued, and the rolls were
not closed until March 4, 1907, Congress refusing to heed
administrative appeals for more time."

But before that final date arrived Congress passed sev-
eral acts, the provisions of which are relied on by relators
as establishing their right. The acts would seem to demon-
strate the contrary, and that the conditions which arose
demanded changes in legislation. It is true that it is.
provided that the rolls of the tribes which were directed
to be made, when approved by the Secretary of the In-
terior, should be final and should constitute the several
tribes which they represented; and it is therefore con-
tended that those provisions became legislative confirma-
tions which the Secretary was without power to disregard,
and that every partial list forwarded to him which he ap-
proved he could not afterwards change, whatever the proof
of mistake, imposition or fraud. A few citations will
prove the unsoundness of the contention.

The act of June 10, 1896, *supra,* which is so much relied
on, was largely superseded by § 21 of the act of June 28,
1898, commonly known as the Curtis Act. 30 Stat. 495,
502, c. 517. The section gave the Commission the power to
investigate the right of persons whose names were on the
rolls and to "omit all such as may have been placed there
by fraud or without authority of law, enrolling only such

as may have lawful right thereto," etc. And it was provided that the Commission "shall make a roll of Cherokee freedmen in strict compliance with the decree of the Court of Claims rendered the third day of February, eighteen hundred and ninety-six." It was further provided that the Commission should "take the roll of Cherokee citizens of eighteen hundred and eighty (not including freedmen) as the only roll intended to be confirmed by this and preceding acts of Congress. . . ."

It is manifest from this act that the contention of relators that the tribal rolls were to be treated or accepted as absolutely confirmed is unsound. One roll only was confirmed. The other rolls were to be corrected, not confirmed; and a roll of the Cherokee freedmen was to be made in conformity with the decree of the Court of Claims—a roll not confirmed, but to be made, so as to exclude the relators because they were excluded by the decree; that is, because they were not residents of the Cherokee Nation at the time of the promulgation of the treaty.

It does not appear that relators were on any roll prior to the passage of the act of June 10, 1896, upon which they so much rely, and therefore within its confirmatory provision, giving it all the force contended for. They were on the Kern-Clifton roll, it is said, but when that roll was made does not appear. The allegation of the petition is that prior to November 16, 1904, the Secretary of the Interior affirmed a decision by the Commissioner of the Five Civilized Tribes which held that relators were entitled to enrollment as citizens, and that prior to that date they were regularly ordered to be placed upon the final roll of freedmen citizens, and that such roll was duly and regularly approved by the Secretary of the Interior on the sixteenth of November, 1906.

But the act of July 1, 1902 (32 Stat. 716, 720, § 27), emphasized the requirement that the enrollment of freedmen

must be made in strict conformity with the decree of the Court of Claims. Congress was even more particular in the act of April 26, 1906 (34 Stat. 137). Section 3 of the act explicitly provided that "The roll of Cherokee freedmen shall include only such persons of African descent, either free colored or the slaves of Cherokee citizens and their descendants, who were actual personal *bona fide* residents of the Cherokee Nation August eleventh, eighteen hundred and sixty-six, or who actually returned and established such residence in the Cherokee Nation on or before February eleventh, eighteen hundred and sixty-seven."

Relators nevertheless insist that notwithstanding they were not entitled to be placed upon the rolls, yet, having been placed there, they cannot be taken off by the Secretary of the Interior; citing in support of the contention certain provisions of the acts of Congress and the congressional policy expressed in them. The policy of the Government, it is said, was to expedite enrollment, with the view to the distribution of the tribal property and the preparation of the Indian Territory for statehood. To these ends the acts of May 31, 1900, 31 Stat. 221, c. 598, and March 3, 1901 (31 Stat. 1073, c. 832), endeavored to speed enrollment matters by directing the Secretary of the Interior to fix a time for closing the rolls, after which no name should be added thereto. Then came the act of July 1, 1902 (32 Stat. 716, c. 1375), which, it is insisted, practically repealed prior acts so far as they concerned enrollments. Such prior acts, it is said, "made approval of enrollments depend upon the completion of the rolls of an entire tribe, and the Secretary's approval under it would await the finishing of enrollments of an entire tribe." And until such time "there would be no allotment to any tribal member." The Secretary's control, hence, continued "until the last," and the congressional policy was likewise postponed. But, it is argued, contrasting the

new measures with the old, under the act of 1902 "enrollment and allotment went hand in hand." This contention is rested on § 29 of the act, which directs lists to be prepared of those found by the Commission to be entitled to enrollment; and, it is provided, that "the lists thus prepared, when approved by the Secretary of the Interior, shall constitute a part and parcel of the final roll of citizens of the Cherokee tribe, upon which allotment of land and distribution of their property shall be made;" and, further, that "when there shall have been submitted to and approved by the Secretary of the Interior lists embracing the names of all those lawfully entitled to enrollment, the roll shall be deemed complete."

A roll made complete, it is argued, by legislation excludes the idea of correction by an executive officer; and, besides, it is urged that the certificates of allotment carry with them the sanction of the law's declaration that they shall be "conclusive evidence" of the rights of the allottee. Physical possession of the lands described in them is to be given, it is pointed out, and, describing the conditions which were created and which would be disturbed by an exercise of power to recall them, it is said that "from the date of selection of their allotments under the law, allottees did lease their allotments for grazing, oil and gas, mineral, and other purposes." And, further, that "allottees also, from the same date, created town sites where practicable, and sold town lots, with their title resting in their allotment selections or certificates," and that such transactions have been declared valid by the Supreme Court of Oklahoma, citing *McWilliams Investment Co.* v. *Livingston*, 98 Pac. Rep. 914; *Godfrey* v. *Iowa L. & T. Co.*, 95 Pac. Rep. 792.

We recognize the strength of the considerations urged, but it certainly did not militate against the congressional policy of the allotment of lands to retain in the Secretary of the Interior the power of revision and correction until

the final moment when jurisdiction was expressly taken from him, as provided in § 2 of the act of April 26, 1906 (34 Stat. 137, c. 1876), that is, the fourth day of March, 1907. That Congress could give such power to the Secretary of the Interior is settled. *Stephens* v. *Cherokee Nation* and *Wallace* v. *Adams, supra.* In all the legislation providing for the making of the rolls care is observed to prevent or correct mistakes and to defeat attempts at fraud. We have seen what power the Dawes Commission was given to investigate the rights of persons whose names were on the rolls, and, as to freedmen, strict compliance with the decree of the Court of Claims was enjoined. By the act of March 3, 1905, 33 Stat. 1048, 1060, c. 1479, the work of completing the unfinished business of the Commission was devolved upon the Secretary of the Interior and all of the powers theretofore granted to the Commission were conferred upon the Secretary. It was subsequent to this act that action was taken as to relators and their names stricken from the rolls. This revisory and corrective power of the Secretary over the allotment of land is similar to that exercised by the Land Department respecting the entries upon public lands, which this court has stated to be correct and annul entries of land which were made upon false testimony and without authority of law. *Cornelius* v. *Kessel,* 128 U. S. 456, 461; *Hawley* v. *Diller,* 178 U. S. 476, 490.

*Judgment affirmed.*