In the Matter of the Application of GLENN W. WOODIN, District Attorney of Chautauqua County, in Behalf of Chiefs of Seneca Nation, Petitioners, for an Order under Section 8 of the Indian Law Removing MINNIE SEELEY and Others, Respondents, from the Cattaraugus Indian Reservation.

County Court, Chautauqua County, August 27, 1931.

*Robert Galloway*, for the petitioners.

*John L. Heider*, for the respondents.

OTTAWAY, J. The facts in this case are not seriously in dispute. It appears that William Seeley, ancestor of the respondents, was a member of the Seneca Nation of Indians. Whatever may have been his tribal ancestry at least he was recognized and enrolled in the Seneca Nation. He settled upon the land in question, which is real estate consisting of a small farm within the limits of the Cattaraugus reservation and located in the county of Chautauqua. He improved this farm and lived upon it during his lifetime. In the year 1894 he died and his surviving son, Jasper Seeley, continued to make this farm his home, living there until the time of his death in 1926.

The Indian title of William Seeley to the land in question was not contestible. His possession of that land had been for much more than the period indicated by the rule adopted by the Seneca Indian council. At a council meeting held February 7, 1863, it was provided: " That the continual possession of improved lands by any Seneca Indian and his assigns for the period of twelve years shall be conclusive evidence of title before any Court of the Seneca Nation of Indians having jurisdiction of such action, excepting therefrom lands which have been sold or conveyed written six months past."

William Seeley did not marry an Indian woman but married a white woman so that Jasper Seeley was the son of an Indian father and a white mother.

Jasper Seeley in turn married a white woman, Minnie Stearns, who is the respondent Minnie Seeley. The other respondents in this case are the children of this marriage of Jasper Seeley and Minnie Stearns. Since the death of Jasper Seeley his wife, Minnie Seeley, and some of the children have resided upon the reservation, but the others have removed therefrom and are now living in white communities, taking no part in Indian life or Indian affairs.

William Seeley was a duly enrolled Seneca Indian and hence a member of that tribe and nation. Jasper Seeley was never

enrolled nor have any of the respondents been enrolled either in the Seneca Nation or in any other Indian tribe. Neither Jasper Seeley nor any of the respondents is named upon the enrollment books of the Indian agent whereby annuities are paid to Indians of the Seneca tribe and none of them receive annuities or " Indian Moneys " as they are often designated.

Neither William Seeley nor Jasper Seeley left a will and their estates are unadministered, the respondents claiming that they are the widow and children of Jasper Seeley and entitled to inherit his real estate under the laws of the State of New York.

Section 8 of the Indian Law provides the procedure by which intruders may be removed from reservation lands and sets up a machinery of the State court to be set in motion by the application of the majority of the chiefs of the nation to the district attorney who shall in turn present the complaint. It is the claim and theory of the petitioners that the children of the white wife of Jasper Seeley did not inherit the land in question; that this land is subject to the general control of the council of the Seneca Nation; and that these respondents claiming to own and secure the benefit of these reservation lands are intruders thereon and should be removed by this procedure. The petitioners urge that these children could not inherit according to the law of descent of the Seneca Nation, which in substance provides, that inheritance is to be determined only through the mother, and that where a mother is not an Indian the children are not Indians and not entitled to become members of an Indian nation.

The facts narrated above were not substantially disputed upon the trial and may be regarded as having been established without controversy. There was litigated before us the question of what was the law and custom of the Seneca Nation so far as the determination of descent is concerned, and upon this question of whether the Seneca Indian law regarded descent as through the mother solely and not through the father, many witnesses were sworn. Without reviewing this voluminous evidence in detail suffice it to say that it had been proven before us not only by a fair preponderance of evidence but beyond any possible doubt that it was the law and custom of the Seneca Nation of Indians that the lineage follows that of the mother; that if the mother be a white woman the children are for all purposes of tribal relationship and law not Indians but white persons.

With such facts conceded and proven we come to the question of whether this law and custom of descent of the Indian Nation shall apply to lands improved by and allotted to the decedent

William Seeley so as to exclude the children of Jasper Seeley and a white wife from inheritance of the real estate in question. If so, the petitioners are entitled to an order removing the respondents as intruders; if not, the respondents are entitled to an order dismissing the proceeding.

The history of the affairs of the Seneca Nation of Indians as the same is found in the reports of treaties, legislation and the decisions of the courts is a long one. It will be of little help to here again review it in detail. Its essential facts may be readily found in the opinion of Mr. Justice KELLOGG in *Matter of Patterson* v. *Seneca Nation* (245 N. Y. 433). With some variation as to detail the status of this Indian nation has been discussed in many judicial decisions, not only in the State courts but in the Federal courts.

One of the early cases was determined by Mr. Justice DANIELS in *Seneca Nation of Indians* v. *Lehly.* On appeal, Mr. Justice MACOMBER delivered the opinion of the Appellate Division, Fifth Department (55 Hun, 83). The case was one where a Seneca Indian had married a white woman and the case before the court tested the question of whether her children could inherit lands upon the Indian reservation. The decision was to the effect that under the statutes authorizing allotment of Indian lands such children " of a white mother had the right to inherit from their father." (So construed in *Hatch* v. *Luckman*, discussed below.) This decision apparently proceeds upon the basic theory that the Indian Law of descent especially as to real estate has been superseded by the general New York State law of descent.

In the case of *Hatch* v. *Luckman*, Mr. Justice WHEELER of our own department wrote at length upon this problem. On appeal, the Appellate Division, Fourth Department, affirmed his order made at Special Term and adopted his opinion as delivered. (155 App. Div. 765.) In his discussion of the *Lehly* case (p. 785), Justice WHEELER refers to the fact that it had been conceded before the trial judge that " there is a custom among the Seneca Nation that the lineage of the child follows that of the mother and is governed by it." Justice WHEELER adds, " in other words, in the face of the concession, custom must give way to law."

The *Hatch* case involved Indian title to real estate upon the Tonawanda Indian reservation. Thomas Skye, a Tonawanda Indian had married Martha George an Indian woman belonging to the Seneca Nation of Indians. The issue of that marriage was the plaintiff, Phoebe Hatch, who sought to recover the possession of the real estate in question and asked a writ of prohibition against the peace makers of the reservation. This was granted by the

Supreme Court at Special Term and the order therefor affirmed by the Appellate Division as we have above indicated. The case follows the same basic theory as the *Lehly* case, to wit: that Indian customs and laws and in fact even the Peace Makers Court and those instruments of government set up by the Indian people for the control of their internal affairs and the management of their reservation property have been superseded by the laws of the State of New York so that the State law of descent of real estate rather than the Indian law and custom in this regard shall be observed.

It has occurred to us that the same result might have been reached had the court applied the guaranty of the original Indian treaties to the effect that not only the Seneca Nation but also the Six Nations and their Indian friends residing thereon (on the reservation) and united with them are guaranteed free use and enjoyment of those lands. (Treaty made at Canadaigua, November 11, 1794.) The petitioner in the *Hatch* case was the daughter of an Indian woman who was the member of another tribe. She was not the daughter of a white woman and perhaps " as a friendly Indian " might logically have received the benefit of this treaty. However, this view of the case is not referred to in the opinion.

While there are other decisions more or less to the same effect we need not here refer to them specifically because they are all based upon substantially the same theory which is stated so directly in the *Lehly* case and the *Hatch* case above referred to.

The *Hatch* case, decided by an eminent jurist of our Supreme Court and affirmed in this department upon his opinion by the Appellate Division, is, of course, controlling upon the determination of this court unless the principles there enunciated have since been repudiated by a higher court. Is this doctrine of subservience of the Indian custom as to lineage and descent to the general enactments of our Legislature now the law of this State?

The principles involved have been more recently passed upon and reviewed by the Court of Appeals in the *Matter of Patterson* v. *Seneca Nation* (245 N. Y. 433), and it seems to us theories enunciated in the *Lehly* and *Hatch* cases have now been clearly disapproved. The *Patterson* case came before the court on a similar state of facts. Nathaniel Patterson was a duly enrolled member of the Seneca Nation. He married a white woman and of this union was born the petitioner, Robert E. Patterson. On due application Robert E. Patterson was refused enrollment as a member of the Seneca Nation not only by the council of that nation but also by the Commissioner of Indian Affairs, the reason given being that he was a son of a white woman and was not an Indian according to

the law and custom of this nation. The proceeding was brought to compel the council of the Seneca Nation to enroll him, to permit him to participate as a voter, to accord to him his property rights and to pay him his share of annuities as a member. At Special Term an order was made in his favor which was affirmed by the Appellate Division without opinion (219 App. Div. 857). This decision was reversed in the Court of Appeals with opinion by Judge KELLOGG in which all concur.

In this opinion Judge KELLOGG reviews the relationship of the Seneca Nation to the State and Nation. He points out that this is a relationship of a weaker nation claiming and receiving the protection of one more powerful and not that of individuals abandoning their national character and submitting as subjects to the laws of a master (p. 437); and concludes that the Seneca Nation of Indians has retained for itself that prerequisite of their preservation and integrity as a nation, the right to determine by whom its membership shall be constituted. (P. 438). He cites with approval early expressions of the court to the effect that we have not attempted to extend our laws   *   *   *   to regulate the manner of their acquiring, holding or conveying property among themselves (p. 439); that when Congress does not act no law runs on an Indian reservation save the Indian tribal law and custom. (P. 440). He says,

" It must be the law, therefore, that, unless the Seneca Nation of Indians and the State of New York enjoy a relation *inter se* peculiar to themselves, the right to enrollment of the petitioner, *with its attending property rights,* depends upon the laws and usages of the Seneca Nation and is to be determined by that nation for itself, without interference or dictation from the Supreme Court of the State." (Italics ours). He then discusses in considerable detail the adoption of the Constitution of the Seneca Nation in the year 1848 with due reference to State legislation for the protection and improvement of the Seneca Nation of Indians, which legislation is not to be " inconsistent with the provisions of this Constitution." He refers to the amended Constitution ratified by the Legislature by chapter 252 of the Laws of 1900, approving the government set up by the Indian Nation and in discussing the claim that the State of New York had " assumed governmental control " of the Indians he says,

" It is true that the constitution gave consent of the nation that laws might be passed ' by the Legislature of the State of New York for the protection and improvement of the Seneca Nation of Indians,' but only in so far as such laws might not be ' inconsistent with the provisions of this Constitution or Charter.'

It gave no consent that the common law of the State of New York should obtain on the Indian reservations. It did not abrogate the customary laws of the nation. The ancient usages and customs of the Seneca Nation, therefore, except as modified by the constitution, or as they might be modified by appropriate legislation of the nation or State, continued as the law of· the Indian land." He refers to the fact that section 55 of this article, known as the Indian Law, gives a definite sanction to Seneca customs and usages and provides that all lands on the reservation shall be held in common by the Seneca Nation subject to the control of the council thereof except lands cultivated and improved by an Indian family in accordance with the laws and usages of the Seneca Nation. The opinion then continues as follows:

" The Indian Law, and especially article 4 thereof, is chiefly notable for the almost complete omission therefrom of any legislative enactments upon matters other than those appertaining to administrative details. The law imposes the marriage and divorce laws of the State upon the Indian nations; it prohibits suits against Indians upon contracts; it forbids the sale or exchange of spirituous liquors for any article received from an Indian in payment, exchange or pawn. It does not otherwise make applicable to Indians either the common law or statute law of the State, whether civil or criminal. *It does not abrogate Indian customs or usages. It does not provide for the descent of property through the father rather than through the mother, as prescribed by the customs or many Indian nations.* It does not provide what shall be the qualifications of membership in the Seneca or any other Indian nation. The conclusion is inescapable that the Seneca tribe remains a separate nation; that its powers of self-government are retained with the sanction of the State; that the ancient customs and usages of the nation, except in a few particulars, remain, unabolished, the law of the Indian land; that in its capacity of a sovereign nation the Seneca Nation is not subservient to the orders and directions of the courts of New York State; that, above all, the Seneca Nation retains for itself the power of determining who are Senecas, and in that respect is above interference and dictation."

It seems to us that this enunciation of the fundamental law of the State as regards the Indians cannot be reconciled with the principles laid down in the *Lehly* and *Hatch* cases. It appears that there have been properly reserved to this Seneca Nation of Indians all powers to conduct their internal affairs. Every effort has been made to vouchsafe to them, general powers of managing themselves and their affairs. Even in the realm of criminal law it became the settled policy of Congress to permit them to deal with offenses

by one Indian against the person or property of another Indian according to their tribal customs and laws. For their own best good Congress (Act of Congress of February 18, 1875; U. S. Code, tit. 25, § 218; 18 U. S. Stat. at Large, 318) provided, in substance, that the Federal courts should be vested with exclusive jurisdiction over seven major crimes but with the exception of these seven major crimes all offenses within the limits of the reservation between Indians were left to the control of the Indian courts.

If then the basic factor and principle of the *Lehly* case is not generally controlling and if the Indian law of descent of property generally prevails upon the reservation rather than the State statutes of descent, we come to the question of whether some specific statutes enacted " for the protection and improvement of the Seneca Nation of Indians " and not " inconsistent with the provisions of this (their) Constitution " give these defendants the right to possession of this particular piece of property. Our attention is called to several provisions of the Indian Law as follows:

Section 7 of the Indian Law provides for partition of tribal lands by the Indian government. It continues, " no lands occupied and improved by any Indian according to the laws, usages or custom of the nation, tribe or band shall be set off to any person other than the occupant or his family."

Section 55 of the Indian Law refers specifically to the Seneca Indians and provides that all lands shall be held in common " except such as have been allotted  *  *  *  or  *  *  *  cultivated and improved by an Indian or Indian family or the heirs thereof, in accordance with the laws and usages of the Seneca Nation."

It is also provided by section 9 of the Indian Law that the council may grant a permit to an Indian not a member of the tribe to reside on tribal lands and " may limit the time and regulate the terms upon which any Indians, not members of such nation,  *  *  * may  *  *  *  reside upon such tribal lands."

Section 8 of the Indian Law also provides " except as otherwise provided by law, no person shall settle or reside upon any lands owned or occupied by any nation  *  *  *  of Indians except the members of such nation."

Section 16 of the Constitution of the Seneca Indians, adopted in the year 1848 and ratified and approved by the State Legislature in 1849 (Chap. 378), amended again in 1898 and again ratified and confirmed by chapter 252 of the Laws of 1900, declares: " The rights of any member of the Ancient Confederacy of Iroquois to the occupancy of their lands and other privileges shall be respected as heretofore."

On November 11, 1794, a treaty was made with the Indians at Canandaigua. It re-established peace with their nation and

defined the boundaries of their land. These boundaries included the part of Chautauqua county in question. The treaty continued as follows: " Now the United States acknowledge all the land within the aforementioned boundaries to be the property of the Seneca Nation; and the United States will never claim the same, nor disturb the Seneca Nation nor any of the Six Nations or their Indian friends residing thereon and united with them, in the free use and enjoyment thereof; but it shall remain theirs, until they chose to sell the same to the people of the United States who have the right to purchase."

It is urged by the defendants that this Indian Law, particularly section 7, insuring possession to an " occupant or his family," and section 55, referring to land " improved by an Indian or Indian family or the heirs thereof in accordance with the law and usages of the Seneca Nation," guarantee the possession of this land in question to these defendants who are the descendants or family of William Seeley. We are not in accord with this view and believe that upon a consideration of the whole subject of Indian affairs it is not sound. If section 7 and section 55 are within the legislative power of this State in so far as they interfere with the customs and control of Indian property upon the reservation and state a law for the descent of property they must nevertheless be read in the light of the other laws and customs applicable to the subject matter. It seems to us that there is the thorough purpose and intent of giving to this nation the control of reservation property so that when the legislative enactment says " family " and " heirs " it must mean the family and the heirs which the Indians themselves recognize. The power to control the internal affairs of this nation remains in the Indian council. This council has the power to determine who shall be members of their nation. (*Patterson Case*, *supra*.) The Indians themselves must have the full power over their tribal and family relationships. To say that they have no such power is to take away some of their control over their own internal affairs.

It is easy to see that sustaining in possession of property the descendants of those Indians who formerly held it but who have married white wives might eventually lead to a situation where practically all of the reservation lands would be in the control of those who were not descended from Indian mothers and hence not entitled to membership in the tribe, not recognized by our government as recipients of annuity moneys and not within tribal control. The control of reservation lands by the Indian council would be very much restricted and the constitutional and treaty guarantees against interference by the State or Nation with the

possession of these lands by the Seneca Nation would be reduced to a mere idle gesture.

If the rule or custom as to the descent of property upon this reservation is to be changed it should be changed by enactment of either the Indian Nation themselves or of the United States Congress. It should not be altered by legislative enactments without the authority of the Indians nor by judicial inroads into the realm of Indian affairs.

It is argued that the *Lehly* and *Hatch* cases give direction to the general trend of Indian affairs and the decisions to have been actuated by the thought that socially and politically the Indian nation would be better off to adopt the State rule of descent of real estate. This contention may be a debatable subject but at all events it is not an end that should be accomplished save by definite legislation in accordance with the treaty rights and standing of this Indian nation.

As the *Lehly* and *Hatch* cases are determinations by higher courts we should, of course, feel required to follow them had not the Court of Appeals definitely repudiated the basic principles expressed in those cases. (See *Patterson Case, supra.*) We conclude that we must follow the *Patterson* case. Having so concluded findings and order may be presented granting the plea of petitioners.