## UNITED STATES v. CITY OF SALAMANCA.
### No. 2254.

District Court, W. D. New York.
May 11, 1939.

George L. Grobe, U. S. Atty., of Buffalo, N. Y., and C. C. Daniels, Sp. Asst. to Atty. Gen., for plaintiff.

George H. Ansley and G. Sydney Shane, both of Salamanca, N. Y., for defendant.

KNIGHT, District Judge.

The United States of America brings this suit for and on its own behalf, and on behalf and as trustee and guardian of the Seneca Nation of Indians, and on behalf of Leona (Pierce) Kenjockety, a member of the said Indian Nation, to set aside a deed of a lot on the Allegany reservation and in the City of Salamanca, New York, sold by such city for non-payment of taxes, and to enjoin further assessment of taxes thereon.

The complaint alleges, among other things, that the Allegany-Cattaraugus tribe of Seneca Indians is under the guardianship of the United States; that at all times it has maintained its tribal relations and kept its property separate from the State of New York and other tribes; that by virtue of certain treaties entered into between the Six Nations, of which it was and is a member, and the United States, it is entitled to the free use and enjoyment of all the tribal lands within the Allegany reservation, including the lands in suit; that Leona (Pierce) Kenjockety is a member of the Allegany-Cattaraugus band of the Seneca Nation and is entitled to the use and enjoyment of the lands in question under and by virtue of the laws and customs of said nation; and that without rightful authority the defendant has attempted to affix a lien upon said lot through the sale thereof for the non-payment of certain municipal taxes.

The defendant moves to dismiss the complaint upon the grounds, in effect, that the United States is not authorized by law to bring the action; that it has not legal capacity to sue; and that the court lacks jurisdiction.

Upon this motion the material allegations of the complaint must be deemed to be true. If the complaint alleges facts sufficient to show that the action may be maintained, the court has jurisdiction. Article III, Section 2 of the Constitution of the United States, U.S.C.A., and Title 28 U.S.Code, section 41, 28 U.S.C.A. § 41 (Judicial Code, section 24, as amended).

The objection that no diversity of citizenship is shown must be dismissed. Such diversity is not required.

The first question to determine is what authority, if any, the United States has over the tribe in question. The Seneca Nation of Indians was a component part of the Iroquois Indian Confederacy, sometimes called the Five Nations and later the Six Nations. The Allegany-Cattaraugus tribe of Indians was a part of the Seneca Nation. The hereditary lands of the Iroquois were in what is now the State of New York, but through their supremacy in arms and political acumen they extended their territory much beyond the limits of that state and came to be the most powerful of Indian tribes. The stubborn resistance of these Indians ultimately secured recognition of their claims to independence and territorial rights in treaties with France and England.

Trade treaties were negotiated with some of the colonies separately and with several of them acting together. After the Revolutionary War the terms of peace between England and the United States contained no provision with reference to the Indians, but shortly after the Treaty of Peace the Federated states entered into the treaty of 1784 with the Six Nations, 7 Stat. 15. Such treaty, the first made by the Federated government with the Six Nations, recognized that the Senecas and other tribes of the Six Nations were under the protection of the United States; fixed the boundaries of lands in which these tribes were to be secure in possession and extinguished the Indian claims to certain lands outside of New York. Any doubt as to whether under the Articles of Confederation certain rights over the Indians were reserved to the states was removed by the adoption of the Constitution. Such Constitution expressly gave to Congress power to regulate commerce with the Indian tribes. Article I, Sec. 8(3), U.S.C.A. Const. The Constitution further provided that all treaties were to be made by the President "with the Advice and Consent of the Senate," Article II, Sec. 2(2), and prohibited any state from entering into any treaty. Article I, Sec. 10(1). Article VI,

544

Clause 2 provided that "Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." By this Constitution it was intended to "give the whole power of managing those affairs [Indian] to the government about to be instituted" and to omit "those qualifications which embarrassed the exercise of it as granted in the confederation." Cherokee Nation v. State of Georgia, 5 Pet. 1, 30 U.S. 1, 18, 19, 8 L.Ed. 25. Dissatisfaction arose over the treaty of 1784, and the treaty of 1789, 7 Stat. 33, was entered into. This treaty confirmed to the Six Nations the lands which they then inhabited, described in both that treaty and the treaty of 1784. In 1794, 7 Stat. 44, still another treaty was made enlarging to a small extent the lands to be held by the Senecas and also making the first provision for the payment of annuity to the Six Nations. By these two last-mentioned treaties the occupancy of the land therein described was granted the Senecas free of the operation of state laws. The United States contracted never to disturb the Indians in the free use and enjoyment of such lands.

New York in 1786 entered into a convention agreement with Massachusetts by which it proposed to grant to that state the preemption right to purchase some 6,000,000 acres in the western part of New York, saving a mile strip along the upper part of the Niagara River, and including all of the Cattaraugus-Allegany reservation. In 1796 Robert Morris acquired from Massachusetts this preemption right. In 1796 and later in 1802 Federal statutes were enacted which in effect prohibited the purchase of any lands or the leasing of any lands from the Indians without the approval of the United States. By the Treaty of the Big Tree (7 Stat. 601) September 15, 1797, the Senecas with the approval of the representatives of the Federal government ceded to Robert Morris 4,000,000 acres of the aforesaid tract, excepting, however, 200,000 acres reserved for certain reservations. Later Robert Morris transferred his rights therein to David A. Ogden for the Ogden Land Company. When the Senecas sought to repudiate their grant, the controversy was settled by the Treaty of 1844, the limits of the Cattaraugus-Allegany reservation being definitely fixed. This reservation is described as a tract about 30 miles in length, 1½ miles in width and containing some 30,469 acres.

When the Allegany reservation was laid out, it was considered of little value. This estimate was soon changed by the extension of railroads through it to the west. Construction of these railroads was purportedly authorized by an Act of Legislature of the State of New York, May 12, 1836, Laws 1836, c. 316. This Act permitted the use of these lands for railroad purposes, but it provided that they could be used for no other purpose, and that the fee should not vest in the railroads. The building of the railroads naturally brought about the growth of settlements and villages along the lines. Thus the City of Salamanca developed around a railway center. The land for these developments was leased from the Indians. These leases at first were taken largely without Federal authority and were held to be invalid by the state courts. Buffalo, R. & P. R. Co. v. Lavery, 1894, 75 Hun 396, 27 N.Y.S. 443; Baker v. Johns, 1886, 38 Hun 625; Ryan v. Knorr, 1880, 19 Hun 540. The State of New York recognized this invalidity and petitioned Congress to ratify such leases. Large investments had been made in reliance upon them, and Congress answered this call for relief in 1875 by legalizing certain leases and providing for further leasing under certain conditions, and later in 1890 by providing for renewals of the terms for 99 years. The lease rentals are paid to a United States Indian Agent and by him distributed to the Indians.

While the Six Nations do not constitute a "foreign" nation as that term is ordinarily used, they are recognized as separate political communities authorized to administer their own internal affairs. The authority in the United States to make treaties with these Indians is declared by the Supreme Court as "co-extensive with the power to make treaties with foreign nations." United States v. Forty-three Gallons of Whiskey, 93 U.S. 188, 197, 23 L.Ed. 846. Speaking of the Cherokee Nation, in Worcester v. State of Georgia, 6 Pet. 515, 561, 8 L.Ed. 483, and what was said there is applicable here, the court said: "The Cherokee nation, then, is a distinct community, occupying its own territory * * *. The whole intercourse between the United States and this nation is, by our Constitution and laws, vested in the government of the United States," and in The Kansas Indians, 5 Wall. 737, 757, 18 L.Ed. 667, the court said: "As long as the United States recognizes their national

character they [Indians] are under the protection of treaties and the laws of Congress, and their property is withdrawn from the operation of State laws."

■ It thus appears that the Iroquois Nation of Indians, from the time of the appearance of the first white settlers, continuously asserted their right to certain lands occupied by them. The French and English claimed it by right of discovery and conquest. Out of these contentions came recognition of the Indian rights within certain reserves. These rights have been guaranteed by this government by its treaties with the Indians and by its laws. It follows as a sequence that the duty rests upon the government to see that the Indians are secure in these possessions. Vide also Peters v. Malin, C.C., 111 F. 244; United States v. Boylan, 2 Cir., 265 F. 165; Lowe v. Fisher, 223 U.S. 95, 32 S.Ct. 196, 56 L.Ed. 364; Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183; Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 431, 56 L.Ed. 820.

■ The nature of the relationship between the United States and these Indians by reason of these legal obligations is that of a guardian toward a ward and from this relationship "sprang obligations to the fulfilment of which the national honor has been committed." Heckman v. United States, supra. The "relation was that of a native claiming and receiving the protection of one more powerful." Worcester v. Georgia, supra. By reason of the "very weakness and helplessness" of the Indians "there arises the duty of protection, and with it the power." United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 1114, 30 L.Ed. 228. "Certain is it that as the United States as guardian of the Indians had the duty to protect them from spoliation and, therefore, the right to prevent their being illegally deprived of the property rights conferred * * *" by law. United States v. Board of Com'rs of Osage County, 251 U.S. 128, 40 S.Ct. 100, 102, 64 L.Ed. 184. A long line of decisions of the Supreme Court commencing with Worcester v. State of Georgia, supra, down to Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478, has defined the relation of the Indian tribes, including the Senecas, as wards of the United States. The United States has never relinquished its jurisdiction, Heckman v. United States, supra; People ex rel. Kennedy v. Becker, 241 U.S. 556, 557, 36 S.Ct. 705, 60 L.Ed. 1166, and its jurisdiction is exclusive. United States v. Boylan, supra.

The State of New York through its legislation and the decisions of its courts has recognized the jurisdiction of the Federal government. People ex rel. Cusick v. Daly, 212 N.Y. 183, 105 N.E. 1048, Ann. Cas.1915D, 367; Patterson v. Council of Seneca Nation, 245 N.Y. 433, 157 N.E. 734; Seneca Nation v. Christie, 126 N.Y. 122, 27 N.E. 275; Seneca Nation of Indians v. Appleby, 196 N.Y. 318, 89 N.E. 835; Woodin v. Seeley, 141 Misc. 207, 252 N.Y. S. 818.

■ The United States has an interest arising out of this relation of guardianship which gives it the right to sue to enforce its obligations and protect the Indians. "During the continuance of this guardianship, the right and duty of the nation to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid." Heckman v. United States, supra. As was said in United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 301, 70 L.Ed. 539: "Its [U. S.] interest arises out of its guardianship over the Indians, and out of its right to invoke the aid of a court of equity in removing unlawful obstacles to the fulfillment of its obligations, and in both aspects the interest is one which is vested in it as a sovereign."

■ The United States has the right to maintain suits in its own courts to enforce its obligations to the Indians. United States v. Boylan, supra; United States v. Fitzgerald, 8 Cir., 201 F. 295; Heckman v. United States, supra; United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L. Ed. 532; Minnesota v. Hitchcock, 185 U. S. 373, 22 S.Ct. 650, 46 L.Ed. 954; United States v. Gray, 8 Cir., 201 F. 291. The court in United States v. Inaba, D.C., 291 F. 416, 419, in referring to section 24 of the Judicial Code, 28 U.S.C.A. § 41, supra, said: "That the United States has the right in its own courts to bring such suits as may be necessary and appropriate for the protection of its Indian wards cannot be doubted." This is so even though the Indian himself could bring the action. United States v. Board of Commissioners of Grady County, 10 Cir., 54 F.2d 593; United States v. Dewey County, D.C., 14 F.2d 784; Board of Com'rs of Tulsa County v. United States, 10 Cir., 94 F.2d

450; United States v. Chehalis County, D. C., 217 F. 281; and cases hereinbefore cited.

Leona (Pierce) Kenjockety acquired the lot in question from her mother under the tribal laws and customs of the Seneca Nation of Indians, of which Nation both were members. The tribal relation has never been changed. The right of inheritance is controlled by the laws, usages and customs of the tribe. Jones v. Meehan, 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49. The allotment did not dissolve the tribal relations,- United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192, nor has the granting of citizenship terminated this status. United States v. Boylan, supra. Fidelia Pierce owned the lands in question when the Congressional Act of 1875 became law. 18 Stat. 330. This provided that "nothing in this section shall be construed to authorize the taxation of any Indian, or the property of any Indian not a citizen of the United States." Section 8. There is nothing seen in this or any other Act of Congress showing the intent to abrogate the provisions of treaties of 1789 and 1794. Under the Constitution these treaties are the supreme law of the land, and the obligations thereunder can be released only by concurrence of both parties.

While we are concerned here only with the right of the government to bring this suit, it is to be said that the laying of any tax by the state or by the municipality is an interference with the rights of the tribes on account of which action by the United States is justified. Act of 1875, supra. Neither the land nor the occupancy are taxable. Were this not so the land or the right to use it could be taken from the Indian. Kansas Indians, supra; Indian Territory Oil Co. v. Oklahoma, 240 U.S. 522, 36 S.Ct. 453, 60 L.Ed. 779; Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S. Ct. 216, 47 L.Ed. 299; United States v. Apple, D.C., 262 F. 200, and United States v. Board of Com'rs of Osage County, supra. It is to be also noted that the New York State Statute of 1857, p. 71, specifically exempts the Allegany-Cattaraugus reservation from the assessment of any tax "so long as said reservations remain the property of the Seneca nation." The premises, though they are within the municipality, are in the "reservation" and nothing has changed the tribal right of the Senecas so far as concerns their ownership of property within the tribe.

Defendant urges that the Act of March 3, 1871, Rev.St. Section 2079 (16 Stat. 566), 25 U.S.C.A. § 71, abolished negotiations by treaty with all Indian tribes and that the Act of February 19, 1875, 18 Stat. 330, superceded and modified all prior treaties made with the Seneca Nation of Indians, "to the extent of the provisions therein contained." The Act of March 3, 1871, expressly excepts from its provisions treaties theretofore made. Were this exception not included the United States could abolish or change a treaty without the approval of the Indian tribe with whom made. It is not seen that the Act of 1875 has any bearing in connection with the Act of 1871. As heretofore noted, it provides for the leasing of certain lands within the reservation of the Seneca Nation, for the collection of rent, and further that the State of New York should have certain authority in connection with the villages laid out on leased land. It also contains the provision hereinbefore noted that the right of the state to lay out highways, build bridges and provide for municipal laws and regulations within such villages shall not be construed to authorize the taxation of any Indian.

The case of People of State of New York ex rel. Kennedy v. Becker, 241 U.S. 556, 557, 36 S.Ct. 705, 60 L.Ed. 1166, cited by defendant, has no bearing since it did not involve reservation lands and the same is to be said with reference to United States ex rel. Pierce v. Waldow, D.C., 294 F. 111, 114, where the question was the authority of the Peace Makers Court to decree the surrender of land. The court in that case said: "The paramount authority of the federal government over them [Indians] is generally conceded, but the government has frequently recognized the right of the state to deal with Indians within its boundary." The last statement is quite true. Following the adoption of the Constitution by the Seneca Nation of Indians in 1848, the state passed numerous statutes relative to the administration of affairs upon the Seneca reservation. With these the federal government has acquiesced, but the state has seemingly recognized the lack of authority to tax Indian lands since it has never imposed any tax or enacted any statute authorizing the imposition of any tax upon such lands.

The motion to dismiss the complaint must be denied.