In the Matter of the PUBLIC SERVICE COMMISSION (STATE DIVISION, DEPARTMENT OF PUBLIC SERVICE), Petitioner, against EDWARDS MOTOR TRANSIT CO., INC., et al., Respondents.

Supreme Court, Special Term, Ulster County, January 19, 1943.

*Sidney Kabalkin* and *Gay H. Brown* for petitioner.

*W. Franklin Ness, Jr.,* for respondents.

BERGAN, J. Respondents are corporations engaged in the transportation of passengers by bus. The corporations have identical names and are closely integrated in organization, management, and the use of facilities. One is a New York corporation; the other a Pennsylvania corporation. The New York corporation holds a certificate of convenience and necessity from the petitioner Public Service Commission authorizing it to transport passengers in intrastate commerce in New York between Buffalo and Springville. The Pennsylvania corporation holds a certificate of convenience and necessity from the Interstate Commerce Commission authorizing it to transport passengers in interstate commerce between Buffalo and Pittsburgh, Pennsylvania.

The Public Service Commission maintains this proceeding to restrain the respondents from transporting passengers in intrastate commerce between Buffalo and Salamanca, a city in the State of New York, without authorization pursuant to the laws of the State. Salamanca is beyond Springville, N. Y., the terminus of the intrastate route authorized for the New York corporation, which holds no certificate to transport passengers to and from Salamanca. It is also a stop on the interstate route of the Pennsylvania corporation. Concededly the Pennsylvania corporation is authorized to carry passengers between Salamanca and points outside New York contemplated within the certificate of the Interstate Commerce Commission. The problem presented

is whether either corporation, under their respective authorizations, may transport passengers between Salamanca and Buffalo or other points within the State of New York.

Upon the trial the facts were stipulated or presented fully by exhibits concerning which there was no dispute. It is readily found from the stipulation, the tickets sold between Buffalo and Salamanca, the tariffs and schedules received in evidence, and other exhibits, that the Pennsylvania corporation carries passengers between Buffalo and Salamanca. The unity in management and control between the two corporations is so marked that it must also be found that the New York corporation carries passengers between Buffalo and Salamanca. Their officers are substantially the same; the tickets sold for the two corporations by the same agency in Buffalo are indistinguishable; the New York corporation uses entirely buses of the Pennsylvania corporation; tickets are furnished for both corporations to the Buffalo agency by the Pennsylvania corporation, and the revenues received for both are remitted by the agency without segregation to the Pennsylvania corporation where they are later segregated.

Moreover, the New York corporation applied in 1938 to the Common Council of the city of Salamanca for permission to operate a bus line through its streets in intrastate commerce, and permission was refused. Its original application to the Public Service Commission for a certificate of convenience and necessity contemplated operations to the city of Salamanca but, on failing to obtain the city's permission, this part of its application was withdrawn. In view of the integration of the corporations and the facts relating to the method of operation of the New York corporation, if an injunction is granted against the Pennsylvania corporation it must extend to both.

The city of Salamanca is in the Allegany Indian Reservation. The Pennsylvania corporation contends that the Allegany Indian Reservation is under the exclusive jurisdiction of the United States; that transportation between points within the State of New York and points within the Indian Reservation is not intrastate commerce; that such commerce is within the jurisdiction of the Interstate Commerce Commission exclusively; that it has received the permission of the Seneca Nation of Indians, the appropriate Indian authority in the Reservation, granting it permission to operate within the Reservation on the route which it uses, and that the Interstate Commerce Commission has granted it the authority of the United States to operate within the Reservation. Therefore, it is contended that the certificate of the Public Service Commission is not required and that the operation may not be restrained.

Whatever else commerce between points in the State of New York and the Allegany Reservation may be, it is not interstate commerce. An Indian nation is not a state of the union. (*Cherokee Nation* v. *State of Georgia,* 5 Peters [U. S.] 1, 16.) And it is not, as Chief Justice MARSHALL pointed out in that decision, a foreign nation (p. 18). " The relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else." Therefore, the commerce within the State with an Indian Nation is intrastate commerce in so far as the authority of the United States to regulate it is made dependent upon its constitutional power to regulate interstate commerce. But the United States is vested with the power to regulate commerce with the Indian tribes. (U. S. Const., art. 1, § 8.) To the extent Congress has occupied this field, a State is excluded from jurisdiction.

The city of Salamanca, while geographically located within the Allegany Indian Reservation, is a modern city of white inhabitants, organized under the laws of New York. (L. 1913, ch. 507.) Transportation by bus of passengers between this city and other points is surely not commerce with an Indian tribe within the contemplation of the Constitution in the delegation of power in this field to Congress, and, indeed, does not relate to Indians or to Indian tribes at all.

While the United States has always regarded the regulation of Indian affairs as being within its special province and as essentially national in character, the history of the relations between the people of New York and the Indians living within the territory of the State requires special treatment in considering the power of the State over Indian reservations and over white communities now existing within Indian reservations.

In 1786, prior to the adoption of the United States Constitution, a dispute existed between New York and Massachusetts over the sovereignty to be exercised in the lands of the Seneca Nation of Indians, which included the present Allegany Reservation. It was settled by granting sovereignty to New York, with certain nonsovereign rights remaining in Massachusetts. (*Blacksmith* v. *Fellows,* 7 N. Y. 401.) In 1794 the United States and the Six Nations entered into a treaty. Title to the lands within the Allegany Reservation was acknowledged by the United States to vest in the Seneca Nation.

As the State grew in population, white persons settled within the Reservation. Railroads were built over its territory. Villages with white population were established. Leases were made between the Indian authorities and white occupants of the

land. In 1848 the Seneca Nation, in convention at the Council House on the Cattaraugus Reservation, adopted a constitution. It asked the aid of the United States and of the State of New York in providing laws for its domestic government. The Legislature in March, 1849, assented to the request. " From then on, at different times numerous laws for their civil government and regulation of their internal affairs were passed " by the New York Legislature. (*United States* v. *Waldow*, 294 Fed. 111, 115.)

In 1875 Congress authorized the Seneca Nation to lease lands in certain areas of the Allegany Reservation. (Act of Feb. 19, 1875; 18 U. S. Stat. 330.) The act confirmed existing leases and provided for the establishment of white villages within certain areas in the Reservation to be defined. Salamanca was one of these. Congress further provided that within the villages so established the municipal laws and regulations of the State of New York might extend over and be in force in those villages. By chapter 188 of the Laws of 1881, the Legislature extended the general laws of the State to the village of Salamanca. Again, under the laws of New York, as it has been seen, Salamanca was organized as a city in 1913. For a somewhat detailed and historical analysis of the development of Indian relations in New York see opinion of KNIGHT, J., in *United States* v. *City of Salamanca* (27 F. Supp. 541).

Therefore, by express request of the Indians themselves the sovereign powers of New York have been extended to the Allegany Reservation in respect of some aspects of Indian government, and, in addition, the exercise by the State of full powers of local government in the white areas of the Reservation has had congressional sanction and has been continuously carried on by the State government.

The Supreme Court considered the powers of the State arising from these relationships in *United States ex rel. Kennedy* v. *Tyler* (269 U. S. 13), but it declined to adjudicate them upon the point that, as the case there arose, remedies available in the courts of New York should first have been exhausted. In *United States* v. *City of Salamanca* (*supra,* p. 546) it was held that the United States could maintain an action on behalf of Indians to enjoin an invalid tax, but it was said that the Federal government has acquiesced in the enactment of numerous statutes for the administration of the Indian reservations.

In 1890 the United States Circuit Court of this district had before it the effect of a Federal statute, prohibiting the introduction of liquor into the Indian country, upon a liquor dealer in the village of Salamanca. (*Benson* v. *United States,* 44 Fed.

178.) The question was whether the laws of New York, under which the dealer was licensed, or the general Federal statute obtained within Salamanca. The court held, among other things, that the Legislature having extended its laws to Salamanca after the Congressional Act of 1875, " the traffic in spirituous liquors, as well as all other kinds of traffic in these villages, is sheltered by the consent of Congress " (p. 180).

There was preserved, however, to the Seneca Nation a rather large measure of sovereign power over its own affairs, notwithstanding its invitation to the State to provide it with governmental aid and the successive legislative enactments in this direction culminating in the present Indian law. (*Matter of Patterson* v. *Seneca Nation,* 245 N. Y. 433.) The Senecas have not been extinguished as " a separate nation " (p. 445). The statutes to be enacted upon invitation of the nation were to be consistent with the Seneca constitution (p. 443); they retain broad powers of self-government " with the sanction of the State " (p. 445). It was held there that the Seneca Nation alone could determine who are Senecas in a controversy arising over the status of one seeking enrollment as a Seneca and that it was not competent for the court to direct enrollment by mandamus. Again, the Circuit Court of Appeals in *United States* v. *Forness* (125 F. [2d] 928) held that the Act of 1875 did not make the " statutory or decisional " laws of New York, specifically the procedural provisions of the Civil Practice Act relating to a tender, applicable to the Reservation in a controversy in which Indian rights to the cancellation of leases were involved.

But the line of separation is too well-marked for confusion, however, between controversies involving the rights of Indians themselves, arising from a continuance of their powers of self-government or from the special ægis of protection given them in pursuance of Federal or State statutes, and controversies arising from the regulation of the white population in areas over which the State has assumed a complete jurisdiction fully recognized by the United States and deemed by the Indians to be no part of their tribal government or rights.

As a white dealer in liquor under State license would be deemed subject to the laws of New York; as controversies between residents of Salamanca over contract or tort would be cognizable in the civil courts of the State; as, indeed, the municipal public regulation of the city of Salamanca over its government property and affairs would be subject to the laws of the State, so it must be apparent that **public transportation**

between Salamanca and other points in New York is a subject solely within the power of State regulation and control. It cannot be assumed by the United States under the tenuous theory of regulating commerce with Indian tribes, for in fact it bears no resemblance to such commerce. It is, on the contrary, a matter to which the power of the State to regulate extends exclusively.

Submit final order enjoining respondents in conformity with petitioner's prayer for relief.